**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1826

DUSTIN BUXTON,

Plaintiff - Appellant,

v.

SANDRA KURTINITIS, individually and in her official capacity as President of
The Community College of Baltimore County; CAROL EUSTIS, individually and
in her official capacity as Dean of Instruction for the School of Health Professions
at The Community College of Baltimore County; ADRIENNE DOUGHERTY,
individually and in her official capacity as Program Director and Coordinator of
Radiation Therapy at The Community College of Baltimore County; CHARLES
MARTINO, individually and in his official capacity as Academic Advisor for the
School of Health Professions at The Community College of Baltimore County;
EBONY THOMAS, individually and in her official capacity as Coordinator for
Selective Admissions in the School of Health Professions at The Community
College of Baltimore County,

Defendants - Appellees.

---------------------------------------

CHRISTIAN LEGAL SOCIETY; NATIONAL ASSOCIATION OF
EVANGELICALS,

Amici Supporting Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge. (1:14-cv-02836-JFM)

Argued: May 10, 2017                                    Decided: July 7, 2017

Before TRAXLER, FLOYD, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Judge Traxler and Judge Harris joined.

**ARGUED:** Carly Farrell Gammill, AMERICAN CENTER FOR LAW & JUSTICE, Franklin, Tennessee, for Appellant. Peter Stephen Saucier, KOLLMAN & SAUCIER, P.A., Timonium, Maryland, for Appellees. **ON BRIEF:** Abigail A. Southerland, Franklin, Tennessee, Michelle K. Terry, Greenville, South Carolina, Francis J. Manion, AMERICAN CENTER FOR LAW & JUSTICE, New Hope, Kentucky; John Garza, GARZA LAW FIRM, P.A., Rockville, Maryland, for Appellant. Clifford B. Geiger, Bernadette M. Hunton, KOLLMAN & SAUCIER, P.A., Timonium, Maryland, for Appellees. Thomas C. Berg, Religious Liberty Appellate Clinic, UNIVERSITY OF ST. THOMAS SCHOOL OF LAW, Minneapolis, Minnesota; Kimberlee Wood Colby, CENTER FOR LAW AND RELIGIOUS FREEDOM, Springfield, Virginia, for Amici Curiae.

FLOYD, Circuit Judge:

Plaintiff-Appellant, Dustin Buxton, applied and was denied admission into the Radiation Therapy Program (RTP) at the Community College of Baltimore County (CCBC) in 2013 and 2014. Buxton brought this action alleging that points were deducted from his application score and that he was denied admission because of his expression of his religious beliefs during his interview in violation of the Free Speech Clause, the Establishment Clause, and the Equal Protection Clause. The district court dismissed Buxton's Free Speech claim and granted summary judgment in favor of the defendants on Buxton's Establishment Clause and Equal Protection claims. Buxton timely appealed his Free Speech and Establishment Clause claims. We affirm.

I

Dustin Buxton applied to the RTP at the CCBC in 2013 and again in 2014. Adrienne Dougherty, is the Director of the RTP at the CCBC. The RTP is a competitive program, and Dougherty limits the number of persons who can be admitted to the RTP based on the availability of clinical placement opportunities. Around 15 students are admitted each year.

In order to meet the minimum qualification for consideration, applicants must have attained a minimum grade point average (GPA) of 2.5 and a grade of "C" or better in certain prerequisite courses. In one of the prerequisite courses, students complete an observation day at a local hospital, and radiation therapists working at the hospital provide Dougherty with feedback about the students they encounter.

3

At the first stage of the application process, applicants receive numerical scores based on (1) their GPA and (2) their observation day. The top qualified candidates are then invited to a second stage, which consists of a logic exam, a writing sample, and a panel interview. Applicants' final admissions scores are made up of three components: (1) GPA, worth 30%; (2) interview and observation day, worth 40%; and (3) a writing sample and critical thinking exam, worth a combined 30%. The candidates with the highest scores are admitted into the RTP.

Buxton applied for admission to the 2013 RTP and, based on his scores from the first stage, was invited to participate in the second stage of the application process. Buxton's final application score ranked 36th out of the 44 candidates who received an interview. Buxton's scores in each individual category were as follows: his writing sample scored a 6 out of a possible 12 (tied for 36th); his pre-requisite course GPA scored an 18 out of a possible 30 (tied for 21st); his observation day score was a 7.2 out of a possible 12 (tied for 35th); his logic exam score was a 15.66 out of a possible 18 (7th); and his interview score was a 9.52 out of a possible 28 points (33rd). *See* J.A. 144–51.

Dougherty's written review of Buxton's 2013 application states in its entirety:

The student did not receive very good feedback from his observation day. He told one of the therapists that he assumed he was guaranteed a spot in the program. He did state that he seemed like a bother to some of the therapists; however they felt he asked questions at inappropriate times, interrupting them at times, and were related to the engineering aspect of the field. In addition, the therapists said that he wrote down/typed everything they said. It was also noted that during a simulation procedure in which IV contrast was injected, he stated something along the lines that he did not sign on for this. This is minor, but the student did not follow directions

4

when asked to initial the admissions process. When responding to the questions on the written sample, he did not fully read the questions and respond to them in the role of a student. The interview committee felt he was not a good fit for this field. His answers to several of the questions were very textbook and lacked interpersonal skills. When asked about important characteristics that a therapist should have he responded with "not to socialize or fraternize" and then in the next sentence he brought up a sense of levity and that it is good to laugh. *He also brought up religion a great deal during the interview. Yes, this is a field that involves death and dying; but religion cannot be brought up in the clinic by therapist [sic] or students.* He mentioned plans to go onto [sic] complete a Dosimetry Program, but I do not think he has researched this career path fully. University of Maryland does offer a 1-year program, but they receive approximately 100 applicants and only have 2 seats available. Physics and Dosimetry may be a possible career path for him, but he lacks the interpersonal skills for this field. If this is something he wants to continue to pursue, I would suggest at least a full week of observation at another facility. His pre-requisite grades could be more competitive (18/30). Linda Brothers may be able to assist with his interpersonal skills.

J.A. 36 (emphasis added).

In 2014, applications to the RTP nearly doubled. Of the 72 applicants who met the RTP's minimum qualifications for consideration, the CCBC decided to interview only the 36 highest-scoring candidates. The top 36 candidates were determined by ranking applicants by their observation day and GPA scores. Dougherty gave Buxton a score of "0" for his observation day, reportedly because he failed to follow Dougherty's recommendation following his 2013 request for feedback that he complete a week of observation days. Nine other candidates who, like Buxton, initially received observation day scores less than "10" were also given a "0" for their observation day score.

Once all of the applicants' observation day and GPA scores were combined and ranked, Buxton's scores did not place him among the top 36 candidates; therefore, he did not receive an interview for the 2014 RTP. No candidate with an observation day score

5

of less than "10" received an interview, thus, even if Buxton would have received the same observation day score he received in 2013 (7.2), he still would have fallen short of the interview cutoff.

Buxton then sued Dougherty and a number of other CCBC employees for alleged violations of the Free Speech Clause, the Establishment Clause, and the Equal Protection Clause. Buxton alleged that the defendants discriminated against him because of his expression of his religious beliefs during his interview. In support of this allegation, Buxton relied heavily on Dougherty's written review, which stated: "[Buxton] brought up religion a great deal during the interview. Yes, this is a field that involves death and dying; but religion cannot be brought up in the clinic by therapist [sic] or students." J.A. 16.

Defendants moved to dismiss the complaint. As relevant here, the district court dismissed Buxton's Free Speech claim with prejudice as to all defendants. *See Buxton v. Kurtinitis* (*Buxton I*), Civ. No. 14-2836, 2015 WL 3937930 (D. Md. June 25, 2015). Buxton was allowed to proceed to discovery on his Establishment Clause and Equal Protection claims against Dougherty only. Following discovery, Dougherty filed a motion for summary judgment as to Buxton's remaining claims, which the district court granted. *See Buxton v. Kurtinitis* (*Buxton II*), Civ. No. 14-2836, 2016 WL 3582004 (D. Md. June 28, 2016).

Buxton timely appealed the dismissal of his Free Speech claim and the grant of summary judgment on his Establishment Clause claim. Buxton has not appealed the grant of summary judgment on his Equal Protection claim.

II

We review the district court's dismissal of Buxton's Free Speech claim as well as the district court's grant of summary judgment as to Buxton's Establishment Clause claim de novo. *Woollard v. Gallagher*, 712 F.3d 865, 873 (4th Cir. 2013); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). We address each claim in turn.

A.

A plaintiff states a valid claim for First Amendment retaliation if the complaint satisfies the following elements: (1) the plaintiff "engaged in protected First Amendment activity," (2) "the defendants took some action that adversely affected [the plaintiff's] First Amendment rights," and (3) "there was a causal relationship between [the plaintiff's] protected activity and the defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (citing *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)). Finding that Buxton's complaint has failed to satisfy the first element, we affirm the district court's dismissal.[1]

---

[1] We note here that because Buxton's Free Speech claim was dismissed by the district court, our analysis is limited to the facts as alleged in Buxton's complaint and any attachments thereto, and does not rely on further facts developed during discovery and presented to the court with respect to the motion for summary judgment on the Establishment Clause claim.

The district court identified[2] three categories of cases pertinent to understanding the first retaliation element—whether Buxton engaged in First Amendment protected activity: (1) employment cases; (2) public forum cases; and (3) cases "where the government is providing a public service that by its nature requires evaluations of, and distinctions based upon, the content of speech." *Jenkins*, 2015 WL 1285355, at \*14 (quoting *Ass'n of Christian Sch. Int'l v. Stearns*, 679 F. Supp. 2d 1083, 1095 (C.D. Cal. 2008), *aff'd* 362 F. App'x 640 (9th Cir. 2010)) (internal quotation marks omitted). We address these in turn.

Most First Amendment retaliation claims arise in the public employment context. In order to establish a prima facie case under this line of cases, a plaintiff must allege facts to show that the speech in question was made "as a citizen [speaking] upon a matter of public concern," and not "as an employee about a matter of personal interest." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *McVey v. Stacy,* 157 F.3d 271, 277 (4th Cir. 1998)). Here, it is clear that Buxton's speech in the interview room was a matter of personal interest; his admittance to the RTP. Furthermore, Buxton was not a public employee, nor was he interviewing to be one. As

---

[2] The district court did not directly lay out its reasoning as to Buxton's Free Speech claim, but rather incorporated its reasoning from a factually similar case, *Jenkins v. Kurtinitis*, Civ. No. 14-1346, 2015 WL 1285355, at \*10-25 (D. Md. Mar. 20, 2015). *See Buxton I*, 2015 WL 3937930, at \*4 ("Therefore, for the reasons explained at length in *Jenkins*, incorporated here, I will grant defendant's Motion . . . ." (citation omitted)). As such, references to the district court's reasoning on this issue refer to the reasoning incorporated from *Jenkins*.

8

such, the district court properly found that this line of cases was inapplicable to the present case.

Buxton contends that the appropriate frame of analysis for his complaint is the public forum framework. This line of cases involves challenges by plaintiffs to government decisions denying them access to "fora," usually government property, for expressive activity. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) ("Recognizing that the Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated, the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." (internal quotation marks and citations omitted)).

Nothing about these cases, however, fits neatly with Buxton's claim. And the Supreme Court already has rejected efforts to force claims like Buxton's into the public forum framework. In *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004), a student denied a selective government scholarship because he planned to pursue a degree in devotional theology raised a claim much like Buxton's, arguing that the denial amounted to an unconstitutional viewpoint-based restriction on speech in a public forum. The Supreme Court disagreed. The purpose of selective educational programs, the Court explained, is "not to 'encourage a diversity of views from private speakers,'" rendering cases dealing with speech forums "simply inapplicable." *Id.* (quoting *United States v. American Library Assn., Inc.*, 539 U.S. 194, 206 (2003) (plurality opinion).

9

Moreover, Buxton has not pointed to a single case in which a court applied—as he requests here—forum analysis to a Free Speech *retaliation* claim. That is because each of the public forum cases deal with the government restricting access to a forum—i.e., preventing the speech from happening altogether. *See, e.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (evaluating whether the government "unconstitutionally excluded a private speaker from use of a public form"). On the other hand, retaliation claims arise after the speech has already happened, presumably after the speaker has gained access to the forum in question. *See, e.g.*, *Constantine*, 411 F.3d at 499 ("Constantine alleges that the defendants violated her First Amendment right to free speech by retaliating against her *after she complained* . . . ." (emphasis added)). Excluding a speaker from participating and retaliating against the speaker for his speech are two different actions, to which we apply different analytical frameworks. Thus, the public forum framework is not the appropriate frame of analysis in the Free Speech retaliation context.

The final relevant category of cases has examined situations where the competitive nature of the process in question inherently requires the government to make speech-based distinctions. In these cases, "where the government is providing a public service that by its nature requires evaluations of, and distinctions based upon, the content of speech," the Supreme Court has "repeatedly rejected a heightened standard." *Stearns*, 679 F. Supp. 2d at 1095 (citing *Am. Library Ass'n*, 539 U.S. at 204–05; *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672–73 (1998)).

10

For example, in *Forbes*, the Supreme Court noted that "the nature of editorial discretion counsels against subjecting [public] broadcasters to claims of viewpoint discrimination." 523 U.S. at 673. "Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others." *Id.* at 674. Applying heightened scrutiny to broadcasting decisions, the Court found, "would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion." *Id.* The Court reasoned that scrutinizing a public station's discretionary decisions would be particularly problematic because "even principled exclusions rooted in sound journalistic judgment can often be characterized as viewpoint based." *Id.* at 673.[3]

Similarly, in *American Library*, the Supreme Court upheld a federal statute that required public libraries to install Internet filters to receive federal funding. 539 U.S. at 212–14. The Court recognized the mission of public libraries was to facilitate learning and thus must have "broad discretion" to decide what material to include in their facilities. *Id.* at 204. Thus, library staff "necessarily consider content in making collection decisions and enjoy broad discretion in making them." *Id.* at 205. Such decisions did not constitute unlawful viewpoint discrimination.

---

[3] Although the Court in *Forbes* ultimately concluded that a public television station may not exclude candidates from public debates based on that candidate's viewpoint, the Court made clear that this holding rested on a "narrow exception" presented by debates, which are fora for political speech and, therefore, must be analyzed under public forum doctrine. 523 U.S at 675–76.

Finally in *Finley*, plaintiffs challenged a provision in the National Foundation on the Arts and the Humanities Act of 1965, as amended and codified in relevant part at 20 U.S.C. § 954(d)(1). 524 U.S. at 572. This provision required the National Endowment for the Arts "to ensure that 'artistic excellence and artistic merit are the criteria by which [grant] applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.'" *Id.* (quoting 20 U.S.C. § 954(d)(1)). Plaintiffs argued "that the provision is a paradigmatic example of viewpoint discrimination because it rejects any artistic speech that either fails to respect mainstream values or offends standards of decency." *Id.* at 580. The Supreme Court disagreed, reasoning that the statute did not violate the Free Speech Clause because "the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Id.* at 587–88. The Court noted that "content-based considerations" are simply "a consequence of the nature of arts funding," and that "absolute neutrality is simply inconceivable." *Id.* at 585 (internal quotation marks omitted). Thus, because determinations of "excellence" are "inherently content-based," the Court held that a government agency could make content-based judgments in allocating competitive art funding. *Id.* at 586.

In perhaps the most closely analogous—albeit non-precedential—case, *Stearns*, the court relied on *Finley* to point out that "[t]he Supreme Court has repeatedly rejected a heightened standard where the government is providing a public service that by its nature requires evaluations of, and distinctions based upon, the content of speech." 679 F. Supp. 2d at 1095. There, several plaintiffs alleged that certain policies established by

12

University of California ("UC") regarding prerequisite courses for admissions purposes violated the Free Speech Clause because they were "used to routinely deny courses submitted by religious high schools" for approval as satisfactory prerequisite courses. *Id.* at 1088–89. The court found that, because "the government is providing a public benefit that is allocated to a limited number of persons through a competitive process," heightened scrutiny was inappropriate. *Id.* at 1097–98. The court then applied rational basis review, and upheld UC's admissions standards. *Id.* at 1098. On appeal, the Ninth Circuit expressly affirmed the district court's reliance on *Finley* and rejection of heightened scrutiny. *Stearns*, 362 F. App'x at 643.

We agree with the court in *Stearns* and find that *Finley* guides our analysis in this case. "Like the government agency that must judge the excellence of prospective art projects, [the CCBC] must judge the excellence of prospective students who apply for" admission to its programs. *See Stearns*, 679 F. Supp. 2d at 1097. Just as UC was "providing a public benefit that is allocated to a limited number of persons through a competitive process," *see id.*, so, too, is the CCBC. In the present case, there are a finite number of available slots open in the RTP program and the CCBC utilizes an interview process in order to narrow down the best applicants for those slots. As is inherent in any competitive interview process, this narrowing requires distinctions to be made based on the speech—including the content and viewpoint—of the interviewee. Indeed, for an interview process to have any efficacy at all, distinctions based on the content, and even the viewpoint, of the interviewee's speech during the interview is required. Would Buxton argue that the defendants violated his right to free speech if they denied him

13

admission because he said, in his interview, that he views cancer as a punishment from God that should not be treated? Such a statement is undoubtedly a "viewpoint." And yet that would be a perfectly valid reason to deny him admission to a program that trains students to treat individuals with cancer. *Cf. Keeton v. Anderson-Wiley*, 664 F.3d 865, 867 (11th Cir. 2011) (holding that requiring a graduate student to complete a remediation plan in order to participate in the university's clinical counseling practicum because of perceived "deficiencies in her ability to be a multiculturally competent counselor, particularly with regard to working with gay, lesbian, bisexual, transgender, and queer/questioning (GLBTQ) populations," did not violate the student's Free Speech rights (internal quotation marks omitted)). The government must be able to take the viewpoints expressed in an interview into consideration when choosing between candidates in a competitive process.

Accordingly, we hold that the Free Speech Clause has no application in the context of speech expressed in a competitive interview. This is not to say that government discrimination in an interview room is immune from constitutional protections, only that the proper review is not under the Free Speech Clause.

In reaching this holding, we acknowledge the Court's observation in *Finley* that it "ha[d] no occasion . . . to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination." *Id.* at 587. The Court pointed out that "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then [the Court] would confront a different case." *Id.* But, the Court did not identify what

14

kind of case it would confront, or from which constitutional provision the applicable protection would originate. As the district court pointed out, "[c]onstitutional protection against arbitrary government decisionmaking, and against 'invidious discrimination,' flows from the Equal Protection Clause of the Fourteenth Amendment, not the Free Speech Clause of the First Amendment." *Jenkins*, 2015 WL 1285355 at *21; *see also Levy v. Louisiana*, 391 U.S. 68, 71 (1968) ("While a State has broad power when it comes to making classifications, it may not draw a line which constitutes an invidious discrimination against a particular class." (citation omitted)).[4] Thus, it seems that the Court in *Finley* was describing the possibility of future cases involving challenges based on Equal Protection—not Free Speech.[5]

Amici, Christian Legal Society and National Association of Evangelicals, fail to recognize this distinction and point us to *Schware v. Board of Bar Examiners*, 353 U.S. 232 (1957), arguing that it supports a finding that the CCBC violated Buxton's Free Speech rights. In *Schware*, the Supreme Court held that membership in the Communist

---

[4] Other constitutional protections—for instance the Free Exercise Clause, the Due Process Clause, and the First Amendment's implied right of free association—would no doubt continue to apply to government discrimination in the context of an interview as well.

[5] We note that even if there were a First Amendment-based prohibition on "invidious viewpoint discrimination" in the context of competitive admissions to educational programs, it would not assist Buxton here. As we describe below, in connection with Buxton's Establishment Clause claim, Dougherty's evaluation of Buxton's speech was related directly to the purpose of the program in question, intended to screen for candidates with strong interpersonal skills and other relevant qualifications rather than to impose a "penalty on disfavored viewpoints," *Finley*, 524 U.S. at 585.

15

Party alone did not justify preventing Schware from taking the state bar exam. The Court stated:

> Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church. Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory.

*Id.* at 239. Far from helping Buxton, however, this case confirms the point that the appropriate cause of action in the present context is not under the Free Speech Clause. *Schware* itself was not a Free Speech case; it was decided on Due Process grounds. *See id.* at 238-40. Furthermore, each of the examples given in *Schware* of "obvious" unconstitutional discrimination, find their constitutional protection in provisions other than the Free Speech Clause.[6]

In sum, Buxton fails to state a claim because the Free Speech Clause does not protect speech expressed in an admissions interview from admissions consequences in a competitive process. Although Buxton argues that this conclusion will open the door to a wide range of discrimination against applicants for government programs or jobs, this fear is misplaced. That the Free Speech Clause is not implicated in this narrow context does not open the door to a parade of discriminatory horribles. Several constitutional protections against discrimination remain in full force even in a competitive application and interview process; the Free Speech Clause is simply not one of them.

---

[6] Respectively, the First Amendment's implied right of free association and/or the Due Process Clause, the Equal Protection Clause, and the Free Exercise (or potentially the Establishment) Clause.

B.

We now move to Buxton's Establishment Clause claim. Framed as an Establishment Clause violation, the appropriate test for this claim is found in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). For government conduct to survive scrutiny under the Establishment Clause, (1) it must have a secular purpose; (2) its primary effect must neither advance nor inhibit religion; and (3) it must not foster excessive entanglement with religion. *See id.* at 612–13; *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 608 (4th Cir. 2012). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987). Because Buxton has failed to show that the CCBC's actions violated any of these prongs, the district court's grant of summary judgment was proper.

Applying the first prong of the *Lemon* test, we ask first whether the government's action was "driven in part by a secular purpose." *Moss*, 683 F.3d at 608 (emphasis removed). The secular purpose for Dougherty's decision not to admit Buxton to the RTP is clear from the record; Dougherty sought to identify the best qualified candidates, with strong interpersonal skills, for a competitive admissions program and Buxton was not among the best qualified candidates.

In a program with only 15 available seats, his application ranked 36th out of 44 candidates. On almost every metric the CCBC used to distinguish between potential applicants, in 2013, Buxton ranked below average: tied for 21st in GPA; tied for 36th on the writing sample; tied for 35th in observation day score; and finally, 33rd in interview score. *See* J.A. 145. The only metric in which Buxton scored in the top 15 was the logic

17

exam, where he placed 7th. Dougherty also specifically noted that the interview panel thought that Buxton "was not a good fit for this field" and "lacked interpersonal skills." J.A. 36.

Buxton argues that the determination that he lacked interpersonal skills was based, at least in part, on the fact that he brought up religion during his interview. It is this narrower act, the alleged penalization of applicants that refer to religion, that Buxton argues must have a secular purpose in order to survive the first prong of *Lemon*.

However, even analyzing this narrower action, the secular purpose for Dougherty's actions remain clear. Using the topics someone chooses to bring up in a conversation is a perfectly secular—and perfectly reasonable—metric for determining that person's awareness of social norms. Whether an individual brings up religion, politics, their sex life, or their love of the New York Yankees, the topics broached by an interviewee are fair, secular metrics for determining that person's interpersonal skills. The *substance* of the topic is not directly relevant; rather, it is the fact that they brought up the topic at all that serves as a basis for the determination.

Dougherty's written review of Buxton noted that he "brought up religion a great deal during the interview." J.A. 36. As Dougherty noted, her concern with Buxton bringing up religion with frequency during the interview was that he would do the same with patients. She believed that this would be problematic, as the topic of religion "cannot be brought up in the clinic by therapist [sic] or students." *Id.* Her concern was neither unreasonable, nor remarkable, and logically translates to a concern about his interpersonal skills as they relate to admission to the RTP.

18

Simply put, it was not Buxton's religious belief that caused his low interview score, but rather his choice of topic in the interview room that informed the committee's determination that he lacked interpersonal skills. This determination was "driven in part by a secular purpose," *Moss*, 683 F.3d at 608, and thus satisfies the first prong of *Lemon*.

Under the second prong of the *Lemon* test, we must determine whether the government's action has the principal or primary effect of advancing or inhibiting religion. *Moss*, 683 F.3d at 608. Here, nothing about Dougherty or the RTP interview committee using the topics discussed by interviewees as a means of determining their level of interpersonal skills can be construed as inhibiting religion. This (quite common) practice may affect the topics broached by interviewees to the RTP, but in no way inhibits anyone's religious belief or practice. As such, the second *Lemon* prong is satisfied.

We need not dwell long on the third *Lemon* prong, excessive entanglement with religion. *Moss*, 683 F.3d at 608. These cases typically deal with the risk of excessive entanglement from the government's "invasive monitoring" of certain activities in order to prevent religious speech. *See, e.g.*, *Bd. of Educ. of Westside Cmty. Sch. v. Mergens ex rel. Mergens*, 496 U.S. 226, 253 (1990). No such monitoring is implicated by the CCBC's interview process, and thus, the third *Lemon* prong is satisfied.

Having satisfied all three of *Lemon*'s prongs, Dougherty's actions do not violate the Establishment Clause. Thus, we conclude that the district court properly granted summary judgment in Dougherty's favor on Buxton's Establishment Clause claim.

19

## III

For the foregoing reasons, the orders of the district court are

*AFFIRMED.*