**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1430

CALEIGH WOOD,

Plaintiff - Appellant,

and

JOHN WOOD; MELISSA WOOD, on behalf of her minor child, C.W.,

Plaintiffs,

v.

EVELYN ARNOLD; SHANNON MORRIS,

Defendants - Appellees,

and

BOARD OF EDUCATION OF CHARLES COUNTY; CHARLES COUNTY PUBLIC SCHOOLS,

Defendants,

------------------------------

CHRISTIAN ACTION NETWORK,

Amicus Supporting Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. George Jarrod Hazel, District Judge. (8:16-cv-00239-GJH)

Argued:  December 11, 2018                              Decided:  February 11, 2019

Before KEENAN, WYNN, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge Keenan wrote the opinion, in which Judge Wynn and Judge Harris joined.

**ARGUED:** Kate Oliveri, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellant.  Andrew G. Scott, PESSIN KATZ LAW, P.A., Towson, Maryland, for Appellees.  **ON BRIEF:** B. Tyler Brooks, Richard Thompson, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellant.  Edmund J. O'Meally, Lisa Y. Settles, PESSIN KATZ LAW, P.A., Towson, Maryland, for Appellees.  David W.T. Carroll, CARROLL, UCKER & HEMMER LLC, Columbus, Ohio, for Amicus Curiae.

BARBARA MILANO KEENAN, Circuit Judge:

In this case, we consider whether two statements concerning Islamic beliefs, presented as part of a high school world history class, violated a student's First Amendment rights under either the Establishment Clause or the Free Speech Clause. The student, Caleigh Wood, contends that school officials Evelyn Arnold and Shannon Morris (the defendants) used the statements about Islam to endorse that religion over Christianity, and compelled Wood against her will to profess a belief in Islam.

Upon our review, we conclude that the challenged coursework materials, viewed in the context in which they were presented, did not violate Wood's First Amendment rights, because they did not impermissibly endorse any religion and did not compel Wood to profess any belief. We therefore affirm the district court's judgment awarding summary judgment in favor of the defendants.

I.

During the 2014-2015 school year, Wood was an eleventh-grade student at La Plata High School, a public high school in Charles County, Maryland. Arnold was La Plata's principal, and Morris was employed as one of the school's vice-principals.

As an eleventh-grade student, Wood was required to take a world history course, which was part of the school's social studies curriculum. The year-long course covered time periods from the year "1500 to the [p]resent." Among the topics covered in the course were the Renaissance and Reformation, the Enlightenment period, the Industrial

3

Revolution, and World Wars I and II. The topics were divided into separate units, with each unit generally being taught over a period of between ten and twenty days.

The smallest unit of the world history course, encompassing five days, was entitled "The Muslim World." The unit was "designed to explore, among other things, formation of Middle Eastern empires including the basic concepts of the Islamic faith and how it along with politics, culture, economics, and geography contributed to the development of those empires."

As part of the "Muslim World" unit, Wood's teacher presented the students with a PowerPoint slide entitled "Islam Today," which contrasted "peaceful Islam" with "radical fundamental Islam." The slide contained the statement that "Most Muslim's [sic] faith is stronger than the average Christian" (the comparative faith statement) (underlining in original). The school's content specialist, Jack Tuttle, testified that use of the comparative faith statement was inappropriate, and that he would have advised a teacher who was considering teaching this statement "[n]ot to do that."

Wood also was required to complete a worksheet summarizing the lesson on Islam. The worksheet addressed topics such as the growth and expansion of Islam, the "beliefs and practices" of Islam, and the links between Islam, Judaism, and Christianity. Part of the worksheet required the students to "fill in the blanks" to complete certain information comprising the "Five Pillars" of Islam. Included in that assignment was the statement: "There is no god but Allah and Muhammad is the messenger of Allah[,]" a

4

portion of a declaration known as the *shahada* (the *shahada* assignment).[1] For ease of reference, we collectively refer to the comparative faith statement and the *shahada* assignment as the "challenged materials."

Wood's father objected to the use of the challenged materials. He asserted to the defendants that Islam should not be taught in the public school and demanded that his daughter be given alternative assignments. He directed his daughter to refuse to complete any assignment associated with Islam on the ground that she was not required to "do anything that violated [her] Christian beliefs." Wood's failure to complete the assignments that, in her view, "promot[ed] Islam," resulted in Wood receiving a lower percentage grade for the course but did not affect her final letter grade.

Wood later sued the defendants,[2] alleging that they violated the Establishment Clause by "impermissibly endors[ing] and advanc[ing] the Islamic religion." Wood further alleged that the defendants violated the Free Speech Clause of the First Amendment by requiring her to complete the *shahada* assignment, thereby "depriv[ing] [her] of her right to be free from government compelled speech."[3] The district court granted the defendants' motion for summary judgment. Wood now appeals.

---

[1] The underlined words reflect the parts of the statement that the students were required to complete.

[2] At the time the complaint was filed, Wood was a minor. Therefore, the suit was initially brought on Wood's behalf by her parents. The complaint later was amended to name Wood as a plaintiff once she reached the age of majority.

[3] Wood's father also asserted separate claims for retaliation under the First Amendment and due process violations related to Arnold's decision to ban him from the (Continued)

5

II.

We review the district court's award of summary judgment de novo. *See Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017). Wood contends that the district court erred in awarding summary judgment to the defendants on both her Establishment Clause claim and her Free Speech Clause claim. We address each claim in turn.

A.

We begin with Wood's Establishment Clause claim. Wood contends that through the comparative faith statement, "Most Muslim's [sic] <u>faith is stronger</u> than the average Christian," the defendants endorsed a view of Islam over Christianity in violation of the Establishment Clause. Wood also argues that the assignment requiring students to write a portion of the *shahada* impermissibly advanced the Islamic religion and compelled Wood to "den[y] the very existence of her God." According to Wood, the challenged materials lacked any secular purpose and had the "effect of promoting and endorsing Islam." We disagree with Wood's argument.

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, cl. 1. In evaluating an Establishment Clause claim, we apply the three-prong test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See Mellen v. Bunting*, 327

La Plata High School premises. Those claims were dismissed by the district court, and have not been pursued on appeal.

6

F.3d 355, 370 (4th Cir. 2003) ("[W]e have emphasized that the *Lemon* test guides our analysis of Establishment Clause challenges."); *Koenick v. Felton*, 190 F.3d 259, 264 (4th Cir. 1999) ("[T]his Court must rely on *Lemon* in evaluating the constitutionality of [government action] under the Establishment Clause." (internal quotation marks and citation omitted)). Under this test, to withstand First Amendment scrutiny, "government conduct (1) must be driven in part by a *secular purpose*; (2) must have a *primary effect* that neither advances nor inhibits religion; and (3) must not *excessively entangle* church and State." *Moss v. Spartanburg Cty. Sch. Dist. 7*, 683 F.3d 599, 608 (4th Cir. 2012) (citing *Lemon*, 403 U.S. at 612-13). The government violates the Establishment Clause if the challenged action fails any one of the *Lemon* factors. *Buxton*, 862 F.3d at 432 (quoting *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987)).

1.

Before applying the *Lemon* test, we must determine the proper scope of our inquiry, namely, whether we should examine the challenged materials in isolation or in the broader context of the world history curriculum. Wood asserts that we must analyze each statement on its own, apart from the subject matter of the class. We disagree with Wood's contention.

The Supreme Court has emphasized that for purposes of an Establishment Clause analysis, context is crucial. *See County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 597 (1989) ("[T]he effect of the government's use of religious symbolism depends on its context."), *abrogated on other grounds by Town of Greece v. Galloway*, 572 U.S. 565 (2014). To "[f]ocus exclusively on the religious component of

7

any activity would inevitably lead to [the activity's] invalidation under the Establishment Clause." *Lynch v. Donnelly*, 465 U.S. 668, 679-80 (1984). Thus, when determining the purpose or primary effect of challenged religious content, courts, including this Circuit, consistently have examined the entire context surrounding the challenged practice, rather than only reviewing the contested portion. *See Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 271 (4th Cir. 2005); *see also Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 692-93 (6th Cir. 2013); *Croft v. Perry*, 624 F.3d 157, 168 (5th Cir. 2010); *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 688-89 (7th Cir. 1994); *Cammack v. Waihee*, 932 F.2d 765, 787 (9th Cir. 1991); *Smith v. Bd. of Sch. Comm'rs of Mobile Cty.*, 827 F.2d 684, 692 (11th Cir. 1987).

Indeed, common sense dictates a context-driven approach. Viewing the challenged statements in isolation would violate the analysis mandated by the Supreme Court in *Lemon*. As we have stated, *Lemon* first requires us to consider whether teaching the challenged materials had some secular purpose. *Moss*, 683 F.3d at 608. Such a determination can only be made by considering the academic framework in which those materials were presented. *See McCreary County v. ACLU*, 545 U.S. 844, 862 (2005); *Adland v. Russ*, 307 F.3d 471, 481 (6th Cir. 2002) ("[C]ontext is critically important in evaluating a state's proffered secular purpose."). And in requiring us to determine whether the primary effect of the challenged materials was to advance or inhibit religion, *Moss*, 683 F.3d at 608, *Lemon* necessarily requires consideration of the contextual setting in which those materials were used, *see Lambeth*, 407 F.3d at 271 (explaining that the "proper analysis" of *Lemon*'s second prong requires examining the effect of a religious

8

display "in its particular setting"). Thus, any attempt on our part to strip statements from their context invariably would lead to confusion and misinterpretation when applying the *Lemon* test.

Manifestly, if courts were to find an Establishment Clause violation every time that a student or parent thought that a single statement by a teacher either advanced or disapproved of a religion, instruction in our public schools "would be reduced to the lowest common denominator." *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1379 (9th Cir. 1994). Such a focus on isolated statements effectively would transform each student, parent, and by extension, the courts, into *de facto* "curriculum review committee[s]," monitoring every sentence for a constitutional violation. *Id.*

School authorities, not the courts, are charged with the responsibility of deciding what speech is appropriate in the classroom. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986)). Although schools are not "immune from the sweep of the First Amendment," academic freedom is itself a concern of that amendment. *Healy v. James*, 408 U.S. 169, 180-81 (1972); *see also Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985); *Keyishian v. Bd. of Regents of Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967). Such academic freedom would not long survive in an environment in which courts micromanage school curricula and parse singular statements made by teachers. Because the challenged materials were presented as part of Wood's world history curriculum, it is in that context that we examine them.

2.

The first prong of the *Lemon* test asks whether the government's conduct has an "adequate secular object." *McCreary County*, 545 U.S. at 865. This directive requires an "inquiry into the *subjective intentions* of the government." *Mellen*, 327 F.3d at 372 (emphasis added). This part of the *Lemon* test imposes a "fairly low hurdle," requiring the government to show that it had a "plausible secular purpose" for its action. *Glassman v. Arlington County*, 628 F.3d 140, 146 (4th Cir. 2010). Notably, the government's purpose need not be "exclusively secular." *Brown v. Gilmore*, 258 F.3d 265, 276 (4th Cir. 2001) (citations omitted). Rather, it is only "[w]hen the government acts with the ostensible and *predominant purpose* of advancing religion" that it violates the Establishment Clause's "touchstone" principle of religious neutrality. *McCreary County*, 545 U.S. at 860 (emphasis added). So long as the proffered secular purpose is "genuine, not a sham, and not merely secondary to a religious objective," that purpose will satisfy *Lemon*'s first prong. *Id.* at 864; *see Lambeth*, 407 F.3d at 270 ("A legitimate secular purpose is . . . sufficient to pass muster under the first prong of the *Lemon* test, unless the alleged secular purpose is in fact pretextual.").

The Supreme Court has recognized the secular value of studying religion on a comparative basis. *See, e.g.*, *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 255 (1963) ("[I]t might well be said that one's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization."). In this case, the comparative faith statement was part of an academic unit in which students studied Middle Eastern empires and the role of Islam. The unit did not focus exclusively on Islam's core principles, but explored "among other things, formation

10

of Middle Eastern empires including the basic concepts of the Islamic faith and how it along with politics, culture, economics, and geography contributed to the development of those empires." Nothing in the record indicates that the comparative faith statement was made with a subjective purpose of advancing Islam over Christianity, or for any other predominately religious purpose. Nor does the record show that the proffered secular purpose of teaching about Muslim empires in the context of world history was pretextual. *See Lambeth*, 407 F.3d at 270. Thus, on its face, the comparative faith statement was introduced for a genuine secular purpose.

Similarly, the *shahada* assignment was a tool designed to assess the students' understanding of the lesson on Islam. In total, the worksheet included 17 questions with 27 blank entries to be completed by the students on the history of Islam, "beliefs and practices" of Muslims, and links between Islam, Judaism, and Christianity. The students were not required to memorize the *shahada*, to recite it, or even to write the complete statement of faith. Instead, the worksheet included a variety of factual information related to Islam and merely asked the students to demonstrate their understanding of the material by completing the partial sentences. This is precisely the sort of academic exercise that the Supreme Court has indicated would not run afoul of the Establishment Clause. *See Schempp*, 374 U.S. at 225 ("Nothing we have said here indicates that such study . . . of religion, when presented objectively *as part of a secular program of education*, may not be effected consistently with the First Amendment." (emphasis added)). Because the school had a predominately secular purpose in teaching world

11

history, we conclude that both the comparative faith statement and the *shahada* assignment satisfy the first prong of *Lemon*.

3.

To meet the second prong of *Lemon*, the challenged government action "must have a primary effect that neither advances nor inhibits religion." *Moss*, 683 F.3d at 608. This requirement sets an objective standard, which "measure[s] whether the principal effect of government action is to suggest government preference for a particular religious view or for religion in general." *Mellen*, 327 F.3d at 374 (citation omitted). We have "refine[d]" this analysis by incorporating the Supreme Court's "endorsement test," which asks whether a reasonable, informed observer would conclude that government, by its action, has endorsed a particular religion or religion generally. *See id.*; *see also County of Allegheny*, 492 U.S. at 592-94 (adopting the endorsement test in the Establishment Clause context). Thus, in this Circuit, the primary effect prong asks whether, "irrespective of government's actual purpose," a reasonable, informed observer would understand that "the practice under review in fact conveys a message of endorsement or disapproval" of a religion. *Mellen*, 327 F.3d at 374 (citation omitted). We presume that a "reasonable observer in the endorsement inquiry" is "aware of the history and context of the . . . forum in which the religious speech takes place." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001) (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779-80 (1995) (O'Connor, J., concurring in part and concurring in the judgment)).

12

The use of both the comparative faith statement and the *shahada* assignment in Wood's world history class involved no more than having the class read, discuss, and think about Islam. The comparative faith statement appeared on a slide under the heading "Peaceful Islam v. Radical Fundamental Islam." The slide itself did not advocate any belief system but instead focused on the development of Islamic fundamentalism as a political force. And the *shahada* assignment appeared on the student worksheet under the heading "Beliefs and Practices: The Five Pillars." Thus, the assignment asked the students to identify the tenets of Islam, but did not suggest that a student should adopt those beliefs as her own.

This is not a case in which students were being asked to participate in a daily religious exercise, *see Lee v. Weisman*, 505 U.S. 577, 598-99 (1992) (holding that requiring students to stand for graduation prayer constituted compelled participation in religious ritual); *Engel v. Vitale*, 370 U.S. 421, 424-25 (1962) (striking down state-sponsored prayer due to the inherently religious nature of prayer), or a case in which Islamic beliefs were posted on a classroom wall without explanation, *see Stone v. Graham*, 449 U.S. 39, 41-42 (1980) (holding that posting the Ten Commandments on a public school classroom wall violated the Establishment Clause). Rather, the challenged materials were "integrated into the school curriculum" and were directly relevant to the secular lessons being taught. *Stone*, 449 U.S. at 41-42. These types of educational

13

materials, which identify the views of a particular religion,[4] do not amount to an endorsement of religion. *See id.*; *see also Parker v. Hurley*, 514 F.3d 87, 106 (1st Cir. 2008) ("Public schools are not obliged to shield individual students from ideas which potentially are religiously offensive, particularly when the school imposes no requirement that the student agree with or affirm those ideas."). A reasonable observer, aware of the world history curriculum being taught, would not view the challenged materials as communicating a message of endorsement.

Additionally, we note that the challenged materials constituted only a very small part of the school's world history curriculum. As we have explained, we must view the effect of the challenged materials within the context in which they were used. *See Lambeth*, 407 F.3d at 271 (examining the primary effect of a religious display "in its particular setting"). Wood does not argue that the world history class itself advanced any religion. Indeed, she readily admits that it is permissible to teach "how the Islamic faith contributed to the development of politics, culture, and geography." As a matter of common sense, an objective observer would not perceive a singular statement such as the

---

[4] Although scholars could debate endlessly the content of the comparative faith statement and its suitability for use in an educational context, the "primary effect" prong of the *Lemon* test "must be assessed objectively." *Mellen*, 327 F.3d at 374. Thus, Wood's argument that the comparative faith statement is a "subjective, biased statement" about Islam is outside the bounds of our consideration whether use of the statement was constitutional. For the same reason, Wood's contention that she viewed the comparative faith statement as offensive, and that some school officials thought the statement was inappropriate, is unavailing. *See Lee*, 505 U.S. at 597 ("We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive."); *Brown*, 27 F.3d at 1383 ("[A] child's subjective perception that a state action disapproves of or is hostile toward his or her religion is not, by itself, sufficient to establish an Establishment Clause violation.").

14

comparative faith statement, or a lone question about a religion's core principle on a fill-in-the-blank assignment, as an endorsement or disapproval of religion. Therefore, we conclude that the primary effect of both the comparative faith statement and the *shahada* assignment was to teach comparative religion, not to endorse any religious belief. Accordingly, the use of the challenged materials satisfies *Lemon*'s second prong.

4.

The final prong of the *Lemon* test asks whether the government's action created "an excessive entanglement between government and religion," *Lambeth*, 407 F.3d at 272-73 (internal quotation marks omitted), which "is a question of kind and degree," *Lynch*, 465 U.S. at 684. Excessive entanglement "typically" involves "the government's 'invasive monitoring' of certain activities in order to prevent religious speech," or the funding of religious schools or instruction. *Buxton*, 862 F.3d at 433; *Comm. for Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 770 (1973) ("Primary among those evils [targeted by the Establishment Clause] have been sponsorship, financial support, and active involvement of the sovereign in religious activity." (citation omitted)). Excessive entanglement may also be shown when the government's entanglement has "the effect of advancing or inhibiting religion." *See Agostini v. Felton*, 521 U.S. 203, 232-33 (1997).

We need not dwell long on the entanglement prong. As already discussed, neither the comparative faith statement nor the *shahada* assignment advanced or inhibited any religion. And there is no evidence in the record that these materials were obtained from a religious institution or benefited any such institution. Finally, there is no evidence that use of the challenged materials resulted in "invasive monitoring" of activities to prevent

15

or advance religious speech. *See, e.g.*, *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 253 (1990). Under the world history curriculum, it appears that lessons on the Muslim world constituted, at most, five days of a year-long course. Thus, we conclude that neither the comparative faith statement nor the *shahada* assignment resulted in an excessive entanglement with religion. Because the challenged materials satisfy all three prongs of the *Lemon* test, we hold that the district court properly granted summary judgment to the defendants on Wood's Establishment Clause claim.[5]

B.

We next consider Wood's Free Speech Clause challenge. Wood argues that the defendants violated her free speech rights by requiring her to complete in writing two missing words of a portion of the *shahada*, namely, that "[t]here is no god but <u>Allah</u> and Muhammad is the <u>messenger</u> of Allah." In her view, "the curriculum implemented and supervised by [d]efendants compelled [Wood] to confess by written word and deed her faith in Allah." We disagree with Wood's position.

Generally, when a governmental entity requires a person "to utter or distribute speech bearing a particular message," we subject that requirement to "rigorous scrutiny." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879

---

[5] In Wood's amended complaint, she objects to other portions of the world history curriculum, such as the fact that that Wood was "instructed from the text of the Qur'an," that Wood was "instructed . . . that [r]ighteous women are . . . obedient" to men, and that the course devoted only a single day to the study of Christianity while multiple days were spent studying Islam. Wood waived these arguments by failing to raise them in her opening brief. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief.").

16

F.3d 101, 107 (4th Cir. 2018) (citation omitted). In the public school setting, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," but retain their First Amendment rights "applied in light of the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). However, the Supreme Court has emphasized that students' First Amendment rights in public schools "are not automatically coextensive with the rights of adults in other settings." *Kuhlmeier*, 484 U.S. at 266.

In considering the right against compelled speech in the public school context, the Third Circuit has explained:

> First Amendment jurisprudence recognizes that the educational process itself may sometimes require a state actor to force a student to speak when the student would rather refrain. A student may also be forced to speak or write on a particular topic even though the student might prefer a different topic. And while a public educational institution may not demand that a student profess beliefs or views with which the student does not agree, a school may in some circumstances require a student to state the arguments that could be made in support of such beliefs or views.

*C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 187 (3d Cir. 2005). We agree with the Third Circuit's reasoning. Although a student's right against compelled speech in a public school may be asserted under various circumstances, that right has limited application in a classroom setting in which a student is asked to study and discuss materials with which she disagrees.

In the present case, the record is clear that the *shahada* assignment did not require Wood to profess or accept the tenets of Islam. The students were not asked to recite the *shahada*, nor were they required to engage in any devotional practice related to Islam.

17

*Cf. W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 631-32 (1943) (distinguishing between compelling students to declare a belief through mandatory recital of the pledge of allegiance, and "merely . . . acquaint[ing students] with the flag salute so that they may be informed as to what it is or even what it means"). Instead, the *shahada* assignment required Wood to write only two words of the *shahada* as an academic exercise to demonstrate her understanding of the world history curriculum. On these facts, we conclude that Wood's First Amendment right against compelled speech was not violated.

## III.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*