# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 15, 2021

Lyle W. Cayce
Clerk

No. 20-20215

Mari Leigh Oliver,

*Plaintiff—Appellee*,

*versus*

Benjie Arnold,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-3234

_____

ON PETITION FOR REHEARING EN BANC

(Opinion: June 29, 2021, 5 Cir., 3 F.4th 152)

Before Wiener, Dennis, and Duncan, *Circuit Judges*.
James L. Dennis, *Circuit Judge*:

Treating the petition for rehearing en banc as a petition for panel rehearing (5th Cir. R. 35 I.O.P.), the petition for panel rehearing is DENIED. The petition for rehearing en banc is DENIED because, at the request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (Fed. R. App. P. 35 and 5th Cir. R. 35).

In the en banc poll, seven judges voted in favor of rehearing (Judges Jones, Smith, Elrod, Duncan, Engelhardt, Oldham, and Wilson), and ten voted against rehearing (Chief Judge Owen, and Judges Stewart, Dennis, Southwick, Haynes, Graves, Higginson, Costa, Willett, and Ho).

ENTERED FOR THE COURT:

/s/ James L. Dennis

JAMES L. DENNIS

*United States Circuit Judge*

JAMES C. HO, *Circuit Judge*, concurring in denial of rehearing en banc:

It's a sad fact of modern life in America that the culture wars are no longer limited to skirmishes between elected officials on Capitol Hill or in our state capitals. They are increasingly fought by students and parents in classrooms and before school boards across America.

This case is just one example. Viewing the evidence in the light most favorable to the plaintiff (as we must at this stage), a public school teacher punished a student for refusing to embrace certain views on America, religion, and race.

And there are countless other examples nationwide. Some teachers require students to view themselves and others differently because of their race—notwithstanding our Nation's commitment to racial equality and color-blindness. *See*, *e.g.*, Christopher F. Rufo, *Woke Elementary: A Cupertino elementary school forces third-graders to deconstruct their racial identities, then rank themselves according to their "power and privilege"*, CITY J., Jan. 13, 2021; Joshua Dunn, *Critical Race Theory Collides with the Law: Can a school require students to "confess their privilege" in class?*, EDUCATION NEXT, May 19, 2021.

Others forbid students from using biological pronouns and other terms that "invalidate" a person's gender identity—notwithstanding the widely-held view that biological pronouns invalidate no one, but are dictated by science, faith, grammar, or tradition. *See*, *e.g.*, Jesse Bunch, *Point Park University: 'Action' to be taken for misgendering other students*, PITTSBURGH POST-GAZETTE, Sep. 27, 2021; Caleb Parke, *College student reinstated after 18-day exile from Christianity class for gender speech*, FOX NEWS, Mar. 20, 2018.

Some teachers force students to express views deeply offensive to their faith. *See*, *e.g.*, Kiri Blakeley, *Seventh grader 'had to say God wasn't real' in classroom assignment at her Texas school*, DAILY MAIL, Oct. 28, 2015; Bruce

Schreiner & Gilma Avalos, *Florida school apologizes after students stomp on 'Jesus'*, NBC NEWS, Mar. 27, 2013.

And still others compel students to endorse certain political positions. *See, e.g.*, *Teacher assigns students to vote for Obama*, ABC7 NEWS CHICAGO, Sep. 18, 2012; Ryan Mills, *Rhode Island Teacher Offered Students Extra Credit to Testify on Critical Race Theory Bill*, NAT'L REV., June 22, 2021.

As in this case, these stories are allegations—not facts proven in a court of law. But they are allegations of constitutional violations that plaintiffs are entitled to pursue. They deserve their day in court—not summary dismissal under a misguided application of qualified immunity.

It should go without saying that forcing a public school student to embrace a particular political view serves no legitimate pedagogical function and is forbidden by the First Amendment. The Supreme Court made this clear in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943). In short, *Barnette* affirms that, if there is any "fixed star" under the First Amendment, it is that government officials—including public school officials—may not engage in viewpoint discrimination. *Id.* at 642.

Both our circuit and our sister circuits across the country have repeatedly reaffirmed this principle. And naturally, this principle applies regardless of what political viewpoint the teacher is attempting to indoctrinate—whether it's a "liberal" or "conservative" public school teacher who is attempting to punish a "conservative" or "liberal" student. No legitimate pedagogical interest is served by forcing a student to endorse the political views of the teacher—not in the examples cited above, and not in the case before us today.

For its part, the dissent by Judge Duncan suggests that the various "conservative" student/"liberal" teacher examples listed above "may" pose constitutional violations. *Post*, at 37. *See also id.* at 36–37 & n.10

4

(collecting cases). The dissent by Judge Elrod likewise suggests that the answers to these examples might be found elsewhere, such as the Fourteenth Amendment. *See id.* at 29.

But it's unclear why they think these claims should succeed, and only Oliver's should lose.

To the contrary, the Duncan dissent is emphatic that "federal judges [do not] run for school board." *Id.* at 36. It proclaims that federal courts have no business "deciding whether class assignments are 'truly pedagogical.'" *Id.* It's troubled that school officials must consider students' First Amendment rights as a "regular part of curricular planning." *Id.* at 32. And it cites Justice Thomas's lone concurrence in *Morse v. Frederick*, 551 U.S. 393, 418–19 (2007), which concludes that "the Constitution does not afford students a right to free speech in public schools." *Post*, at 36.

Likewise, the Elrod dissent says that "[p]arents may see to it that their children avoid such indoctrination"—but "not in a federal courthouse"—only "in a local school board meeting or at the ballot box," where "'elected officials [are] accountable to the American voter.'" *Id.* at 29. *But compare Dr. A. v. Hochul*, 595 U.S. _, _ (2021) (Gorsuch, J., dissenting from the denial of application for injunctive relief) (principles in *Barnette* "are not matters to 'be submitted to vote; they depend on the outcome of no elections,'" but are "this Court's duty" to enforce) (quoting 319 U.S. at 638).

Translation: School boards can do whatever they want.

This may explain why the dissenters say only that the above examples "may" pose constitutional violations—which is to say that they may *not* pose a constitutional violation—and certainly no *obvious* one. So under the dissenters' view, these claims, like Oliver's, would presumably be summarily dismissed on qualified immunity grounds.

Fortunately, the dissenters' view does not represent the law of our circuit. In our circuit, the above examples, no less than Oliver's, state constitutional violations that warrant judicial protection.

Accordingly, I concur in the denial of rehearing en banc in this case. I write separately to discuss, first, why this case demands further proceedings under the First Amendment, and second, why this case does not warrant summary judgment based on qualified immunity.

## I.

Schools should educate—not indoctrinate. Teachers can teach. And teachers can test. But teachers cannot require students to endorse a particular political viewpoint.

Education is "the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). It's essential to ensuring that students obtain the knowledge they will need to become productive members of society and faithful participants in democracy. *See*, *e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972) ("[E]ducation is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence.").

So it's "clearly established that a school may compel some speech." *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 350 (5th Cir. 2017). "Otherwise, a student who refuses to respond in class or do homework would not suffer any consequences." *Id.*

Teachers may obviously test students to confirm their knowledge of various topics. For example, "a teacher may, without fear of personal liability, 'assign students to write 'opinions' showing how Justices Ginsburg and Scalia would analyze a particular Fourth Amendment question.'" *Id.* (quoting *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002)).

6

But no legitimate pedagogical interest is served by forcing students to agree with a particular political viewpoint, or by punishing those who refuse. That would offend the First Amendment—as both our court and other circuits across the country have repeatedly recognized. *See*, *e.g.*, *Brinsdon*, 863 F.3d at 349 (educators may not "seek[] to inculcate [particular political] beliefs").[1] *See also C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 187 (3rd Cir. 2005) ("[A] public educational institution may not demand that a student profess beliefs or views with which the student does not agree."); *Wood v. Arnold*, 915 F.3d 308, 319 (4th Cir. 2019) (same); *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) ("A university cannot compel a student to alter or violate her belief systems . . . as the price for obtaining a degree.") (citing *Barnette*, 319 U.S. at 342).[2]

## A.

This bedrock constitutional principle is plainly implicated in this case. A high school sociology teacher, Benjie Arnold, required his students to

---

[1] By citing *Brinsdon*, I do not mean to suggest I would have necessarily reached the same judgment based on the facts there. To the contrary, I might very well have voted for rehearing en banc in *Brinsdon* and denied qualified immunity there too. My only point is that *Brinsdon* stands for the same underlying constitutional principle that applies here— public school teachers may not force students to agree with their personal political views.

As for the dissenters' notion that we should rehear *this* case en banc in order to "clarify" any tension between the panel decision here and *Brinsdon*, *post*, at 34 n.6: I voted against en banc rehearing because the panel here applied the correct constitutional rule, and did so correctly. So I saw no reason to delay the litigation further—and to tax the parties (and parents) with time-consuming en banc proceedings.

[2] The Duncan dissent alleges that the panel decision here creates a circuit split with *Wood*. *See post*, at 32–33. But *Wood* recites the same rule I quoted above—that "a public educational institution may not demand that a student profess beliefs or views with which the student does not agree." 915 F.3d at 319 (quoting *C.N.*, 430 F.3d at 187). The dissent claims "*Wood* would come out differently in our circuit." *Post*, at 33. I don't see why. Obviously teachers may ask students to demonstrate their knowledge by repeating what they have learned (*e.g.*, in a history lesson about various religions).

transcribe the Pledge of Allegiance and listen to the Bruce Springsteen song "Born in the U.S.A." Arnold gave this assignment to "'teach students that people sometimes recite things every day out of habit and without thinking about what they are actually saying.'" *Oliver v. Klein Ind. Sch. Dist.*, 448 F. Supp. 3d 673, 697 (S.D. Tex. 2020) (quoting Arnold).

One of his students, Mari Leigh Oliver, did not wish to participate in this particular assignment. That's because, as "a young black woman . . . , she feels that the portion declaring America to be a nation 'under God' fails to recognize many religions and does not match her personal religious beliefs"—and because, "contrary to the words of the Pledge, there is not 'freedom and justice for all' in America because she and other black people continue to experience widespread racial persecution." *Oliver v. Arnold*, 3 F.4th 152, 155–56 (5th Cir. 2021).

It's easy to understand how those of us who deeply love this country would be upset by these sentiments. But like it or not, it's hard to claim that Oliver wasn't "thinking about" the words of the Pledge—after all, her whole point was that she strongly disagrees with the words of the Pledge. If anything, Oliver's response might be an object lesson in—to take Arnold at his word—the importance of not "'recit[ing] things every day out of habit and without thinking about what [you] are actually saying.'" *Oliver*, 448 F. Supp. 3d at 697 (quoting Arnold). *Cf.* DEAD POETS SOCIETY (1989) ("Mr. Dalton, will you be joining us?" "Exercising the right not to walk." "Thank you, Mr. Dalton. You just illustrated the point.").

Yet Arnold informed Oliver—in front of the entire class—that he would give her a grade of "zero" on the assignment. *See Oliver*, 448 F. Supp. 3d at 687. What's more, Arnold went on and delivered extended remarks that confirmed that his agenda here was not pedagogical, but personal. As he told the class, "you can have all the beliefs, and resentment, and animosity

that you want." *Id.* at 697 (quoting Arnold). But "if you can tell me two countries you'd rather go to, I will pay your way there if they're communist or socialist. Most of Europe is socialist and it's crumbling. Or it's communism. But if you ever come back you have to pay me twice what it cost me to send you there." *Id.* (quoting Arnold) (cleaned up). "You know there's a lot of things I complain about. So when it comes time in November I go vote, or I protest in writing, in legal. Those are the ways we do it in America. Where a country will crumble is when people coming into a country do not assimilate to that country. That doesn't mean you forget Day of the Dead, and whatever cultures, you maintain your language. That doesn't mean that. But you're not gonna drive on the left side of the road, and you're not gonna impose Sharia law. Because it's not. This. Country. But what is happening, and I can say it a lot more than you because I've lived longer. It's almost as [if] America's assimilating to THOSE countries." *Id.* at 697–98 (quoting Arnold) (cleaned up).[3]

The point here is not to determine who's right and who's wrong about the Pledge of Allegiance and the values for which it stands. It's not to decide whether Oliver was being courageous and principled, or obnoxious and

---

[3] Oliver also alleges that Arnold subsequently retaliated against her by treating her unfavorably in various ways. *See id.* at 687 ("Oliver told Assistant Principal Walters that Arnold had given her a zero on the pledge assignment, called her by the wrong name, moved her seat repeatedly because he could not 'see her eyes' to see if she was sleeping (despite other students obviously sleeping in class), and made a condescending reference to her debate accomplishments, among other things."). School administrators responded by directing Arnold to "be neutral in class discussions" and "sensitive to students' rights in regards to the Pledge," and to "[a]ssign alternate work instead of requiring the writing or recitation of the Pledge as needed for any student that may object." *Id.* They also instructed Arnold to "[m]onitor students by leaving [the teacher's] desk in order to aid in seeing their eyes," to "[i]nteract with Oliver only as necessary as teacher of record," and "not move her again, [and] instead walk [around] the room to ensure he 'saw students[']' eyes at all times.'" *Id.* And they placed a written summary of these discussions in Arnold's personnel file. *Id.* at 687–88.

ungrateful. We can stipulate that patriotism is important, and that America is the greatest nation on Earth, while acknowledging that one of the reasons is because our Constitution protects freedom of speech and liberty of conscience for all Americans, including Oliver.

The First Amendment does not vary based on whether a particular viewpoint is agreeable or offensive to one community or another. It protects every student in classrooms across the country who has been coerced into expressing a particular position, whether on matters of race, gender, religion, or politics. That includes Oliver. And that is so whatever one may think of her views. As the Supreme Court observed in affirming the constitutional right to burn our Nation's flag, "we do not doubt that the government has a legitimate interest in making efforts to preserve the national flag as an unalloyed symbol of our country." *Texas v. Johnson*, 491 U.S. 397, 418 (1989) (cleaned up). But "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Id.* at 414.

Based on the record evidence, including Arnold's own remarks, a jury could reasonably conclude that the Pledge assignment served no legitimate pedagogical purpose, and that Arnold was engaged in nothing more than viewpoint discrimination against one of his students. *See, e.g.*, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1300 (10th Cir. 2004) ("[I]t is clearly established that a pretextual speech restriction that is not justified by a legitimate pedagogical concern, and is based rather on religious discrimination, would violate [a student's] First Amendment rights."); *Ward*, 667 F.3d at 738 ("A reasonable jury could find that the university dismissed [the student] from its counseling program because of her faith-based speech, not because of any legitimate pedagogical objective. A university cannot compel a student to alter or violate her belief systems based on a phantom policy as the price for

10

obtaining a degree."); *Settle v. Dickson Cnty. Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995) (teachers may not limit or grade speech in the classroom "as a pretext for punishing the student for her . . . political persuasion").[4]

It's also possible, to be sure, that Arnold can convince a jury that he was trying to further a legitimate pedagogical objective, not to punish Oliver for disagreeing with him. But that is precisely the point—the record evidence is sufficient to warrant further proceedings, and thus to preclude summary judgment on grounds of qualified immunity.

**B.**

The Duncan dissent responds by theorizing that the Pledge assignment in this case was nothing more than a memorization exercise. *See post*, at 32. Based on that premise, the dissent even scolds the panel (and me) for putting any number of pedagogically traditional memorization assignments in constitutional jeopardy as a result. *See id.*

The dissent's theory contradicts common sense—not to mention the record in this case.

Let's remember: We're talking about a sociology class for high school *seniors*. By the time students take Arnold's class, they will have listened to (if not voluntarily participated in) the verbal recitation of the Pledge of Allegiance every morning of every school day for over a decade. *See*, *e.g.*,

---

[4] The dissenters contend that it is wrong for a court to examine a teacher's motive. *See post*, at 26–27, 33–36. But as the above cases affirm, courts may determine whether a stated pedagogical purpose is "legitimate" or a "pretext" for viewpoint discrimination. We're just asking whether Arnold is serving a pedagogical interest—or a personal, political one. Under the dissent's view, by contrast, courts would be required to defer to school officials—both in this case and in the examples set forth in my introduction.

Along the same lines, I do not understand the dissent's criticism of *Corder v. Lewis Palmer School District No. 38*, 566 F.3d 1219 (10th Cir. 2009). *See post*, at 35 n.7. Because under the dissent's view, *Corder* got it exactly right—courts must defer to schools, period.

*Croft v. Governor of Texas*, 562 F.3d 735, 746 (5th Cir. 2009) ("The 2003 Amendments changed the way that every schoolchild in Texas begins the day. They provide for the recitation of the pledges of allegiance to the flags of the United States and Texas, followed by a minute of silence for students to 'reflect, pray, meditate, or engage in any other silent activity.'") (quoting TEX. EDUC. CODE § 25.082(b)); *Croft v. Perry*, 624 F.3d 157, 168 (5th Cir. 2010) ("requiring school children . . . to sit and listen while teachers and other students recite" the Pledge does not violate the Constitution).

So it strains credulity that the pedagogical purpose of this exercise was for high school seniors to memorize the Pledge. It wasn't—as Arnold's testimony confirms. Arnold gave this assignment on the *assumption* that high school seniors have already memorized the Pledge. This was a *sociology* assignment designed to "'teach students that people *sometimes recite things every day out of habit* and without thinking about what they are actually saying.'" *Oliver*, 448 F. Supp. 3d at 697 (quoting Arnold) (emphasis added).[5]

In short, the purpose of the assignment wasn't to *memorize* the Pledge—it was to *analyze* it. Moreover, the problem here wasn't that Arnold asked students either to memorize or analyze an important text. It's that he then used the assignment as a pretext to punish Oliver for disagreeing with his view of the Pledge—as his own words again confirm.

This is indefensible. Even the dissent acknowledged that this was "a curious teaching method." 3 F.4th at 164 (Duncan, J., dissenting). But it's more than that. If left unchecked, it establishes a dangerous precedent.

---

[5] The Elrod dissent suggests this was a bona fide memorization assignment, because according to Arnold, some of his students can say the Pledge but can't write it. *See post*, at 28 n.7. But if that's his theory—that high school seniors can't write the Pledge despite a lifetime of exposure to it—Arnold will have the opportunity at trial to attempt to reconcile it with his prior statements.

Imagine that another public high school teacher prepares the following "spelling" assignment: A worksheet tells the story of a person whose gender identity differs from their biological sex at birth. The pronouns in that story are all left blank. The teacher instructs students to fill in the blanks of that story with female pronouns. Now imagine that the teacher's required pronoun usage deeply offends one or more students. May the teacher punish students who refuse to endorse the teacher's pronoun usage, on the ground that it's just a "spelling" test to ensure that high school seniors know how to spell "she" and "her"? (Does it matter whether the student is offended because she believes strongly in pronouns consistent with biological sex at birth, or pronouns that accommodate a person's preference?)

To Arnold's credit, he admits his was no memorization exercise—just as, in my hypothetical, one would hope the teacher would admit this was no spelling test. But let's say both teachers lie. They claim that these are bona fide memorization and spelling assignments. Under established precedent, courts may ignore such patently pretextual justifications in order to protect First Amendment rights of conscience—and disregard either assignment as mere pretext for enforcing orthodoxy. *See*, *e.g.*, *Axson-Flynn*, 356 F.3d at 1300; *Ward*, 667 F.3d at 738; *Settle*, 53 F.3d at 155.

The point is that Arnold's sociological exercise for high school seniors bears no resemblance to the traditional Pledge memorization assignment typically assigned in elementary school. So the dissent's concerns thus seem quite misplaced to me. The panel decision doesn't threaten memorization assignments any more than my hypothetical case threatens spelling tests. Students and teachers throughout this circuit may rest assured that they may

continue to memorize important texts without fear of courting constitutional controversy.[6]

## II.

Under the doctrine of qualified immunity, a § 1983 plaintiff must state not only a constitutional violation, but a "clearly established" one.

A plaintiff ordinarily defeats qualified immunity by citing governing case law finding a violation under factually similar circumstances. But "that is not the only way to defeat qualified immunity." *Villarreal v. City of Laredo*, 17 F.4th 532, 539 (5th Cir. 2021). "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.'" *Id.* (cleaned up). "The central concept is that of 'fair warning.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope*, 536 U.S. at 740).

So an official who commits a patently "obvious" violation of the Constitution is not entitled to qualified immunity. *Hope*, 536 U.S. at 745.

## A.

It should be obvious that the First Amendment forbids a public school teacher from punishing a student for refusing to agree with the teacher's personal political views, whatever views those may be. What's more, this should have been obvious to Arnold for multiple reasons.

---

[6] Similarly, teachers need not worry that they are now forbidden from issuing "in-class writing assignments," as Judge Elrod suggests. *Post*, at 23. They simply can't misuse writing assignments (nor spelling tests) to engage in viewpoint discrimination.

To begin with, it's hard to imagine how the Supreme Court could have been more emphatic than this: "If there is any fixed star in our constitutional constellation, it is that no official . . . can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414. Simply put, public officials can't engage in viewpoint discrimination.

Moreover, longstanding federal Department of Education guidelines reinforce the conclusion that teachers may not punish students based on their political or religious viewpoints. "Students may express their beliefs about religion in homework, artwork, and other written and oral assignments free from discrimination based on the religious content of their submissions." U.S. Department of Education, *Guidance on Constitutionally Protected Prayer in Public Elementary and Secondary Schools*, Feb. 7, 2003, *available at* https://www2.ed.gov/policy/gen/guid/religionandschools/prayer_guidanc e-2003.html. "Such home and classroom work should be judged by ordinary academic standards of substance and relevance and against other legitimate pedagogical concerns identified by the school." *Id.* "Thus, if a teacher's assignment involves writing a poem, the work of a student who submits a poem in the form of a prayer (for example, a psalm) should be judged on the basis of academic standards (such as literary quality) and neither penalized nor rewarded on account of its religious content." *Id. See also Memorandum on Religious Expression in Public Schools*, 31 WEEKLY COMP. PRES. DOC. 1227, 1229 (July 17, 1995) ("Students may express their beliefs about religion in . . . assignments free of discrimination based on the religious content of their submissions. Such home and classroom work should be judged by ordinary academic standards of substance and relevance, and against other legitimate

pedagogical concerns identified by the school."). *Cf. Hope*, 536 U.S. at 741–42 ("in light of . . . a DOJ report informing the [defendant] of the constitutional infirmity in [the alleged misconduct], we readily conclude that the respondents' conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Finally, school officials specifically and repeatedly warned Arnold to respect "Oliver's right to abstain from the Pledge." *Oliver*, 3 F.4th at 157. *See also id.* at 156 ("the [school] principal held a meeting with Oliver's teachers, including Arnold, and instructed them that Oliver was not required to participate in the Pledge"). *Cf. Hope*, 536 U.S. at 741–42 (prison guards should have known that they were violating inmate's rights based on an Alabama Department of Corrections regulation).

So Arnold received ample warning that forcing Oliver to embrace the Pledge over her personal, political, and religious objections would violate her constitutional rights. *Id.* at 740.

**B.**

In response, the Duncan dissent applies a surprisingly narrow reading to *Barnette*. *See post*, at 31–32. It concludes that *Barnette* does not apply to written assignments, and that no case says otherwise. *See id.*

In particular, the dissent theorizes that *Barnette* protects students only against forced verbal recitations of the Pledge of Allegiance. It says that *Barnette* is only about a "prescribed ceremony" involving "the compulsory flag salute and pledge that required affirmation of a belief and an attitude of mind" by compelling a "'stiff-arm' salute . . . the right hand raised with palm turned up." *Id.* at 31 (quoting *Barnette*, 319 U.S. at 628, 634) (cleaned up). The dissent concludes that "[t]he panel's decision to uncritically extend *Barnette* to a written assignment warrants en banc review." *Id.* at 31–32.

16

But it doesn't. We don't need to grant en banc review to recognize the broad First Amendment protections recognized in *Barnette*. Because our en banc court has already done so.

Just look at what our court said in *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (en banc). The decision is badly (and tragically) splintered. But the majority made amply clear that *Barnette* stands for far more than the right not to give a "stiff-arm" salute while forcibly reciting the Pledge.

Indeed, the Barnette sisters appeared before our en banc court as amici, and even presented oral argument through counsel, to explain how their Supreme Court victory also protected the religious speech of the students in *Morgan*—claims that have nothing to do with the ceremonial recitation of the Pledge with a stiff-arm salute.

And the en banc majority enthusiastically agreed. It read *Barnette* to hold just what it said—that "'[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 401–02 (Elrod, J., writing for the majority) (quoting *Barnette*, 319 U.S. at 642). The majority was in fact quite emphatic on this point: "This prohibition is so well-established as to be 'axiomatic.'" *Id.* at 401. "When the government targets . . . particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* (quotations omitted).[7]

---

[7] The Elrod dissent today suggests that the "fixed star" of *Barnette*—the prohibition on viewpoint discrimination—is not "fixed" enough to overcome qualified immunity. *See post*, at 25 ("looking to a 'fixed star' is a sign that the right is being assessed at far too high a level of generality"); *id.* at 29 ("Read at the interstellar level of generality, qualified immunity provides no safe harbor."). So the "fixed star" is "axiomatic" no more. *Morgan*, 659 F.3d at 401 (Elrod, J., writing for the majority). *But see Dr. A.*, 595 U.S.

Moreover, the majority seemed exasperated by school officials who, "[e]ven in the face of *Barnette*" and other cases, continue to "contend that the First Amendment does not protect elementary school students from viewpoint discrimination—an assertion belied by the facts of the cases themselves." *Id.* at 404.

In sum, there's no need to go en banc to confirm that the bedrock First Amendment principles upheld in *Barnette* extend well beyond the "prescribed ceremony" and "stiff-arm salute" that occurs every morning in public schools across our circuit. Because we've already done so.

## III.

I have previously criticized the doctrine of qualified immunity as contrary to the text and original understanding of 42 U.S.C. § 1983. *See*, *e.g.*, *Horvath v. City of Leander*, 946 F.3d 787, 795, 800–03 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part). That's because I see no textualist or originalist basis for requiring § 1983 plaintiffs to demonstrate not only a constitutional violation, but a "clearly established" one. *Id.* Contrast the Antiterrorism and Effective Death Penalty Act of 1996, in which Congress expressly codified a "clearly established" requirement into law. *See id.* at 800 (quoting 28 U.S.C. § 2254(d)).[8]

But to make matters worse, we often get things precisely backwards when we dutifully apply the doctrine of qualified immunity. "[W]e grant

---

at _ (Gorsuch, J., dissenting from the denial of application for injunctive relief) ("fixed star" passage in *Barnette* "is among our Nation's proudest boasts").

[8] *See also* Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 STAN. L. REV. 1337, 1342 (2021) ("The Act's text, both originally and as codified today in 42 U.S.C. § 1983, says nothing about state-officer immunities."); *id.* at 1346 ("qualified immunity at common law could be overridden by showing an officer's subjective improper motive, while today the clearly-established-law test applies").

immunity when we should deny—and we deny immunity when we should grant." *Id.* at 795. We "find constitutional violations [clearly established] where they do not [even] exist"—and ignore them when they are patent. *Id.* at 801.

To take an example familiar to our en banc court, imagine we denied qualified immunity to a police officer for making a split-second, life-or-death decision to protect innocent citizens against violent criminals—but granted qualified immunity to a public school teacher who deliberately punished a student for exercising her freedom of conscience on one of the most sensitive issues dividing our Nation. To my mind, that would turn the law upside down. *But see Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) (en banc) (denying qualified immunity to police officer engaged in good-faith, split-second decision to fire at potential mass shooter); *Winzer v. Kaufman Cnty.*, 940 F.3d 900 (5th Cir. 2019) (denying en banc rehearing after panel denied qualified immunity under similar circumstances).

After all, consider this: One of the primary reasons for qualified immunity is that we do not want to chill government officials from the "unflinching discharge of their duties." *Horvath*, 946 F.3d at 801 (Ho, J., concurring in the judgment in part and dissenting in part) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2nd Cir. 1949) (Hand, C.J.)). "The specter of personal liability for a mistake in judgment may cause a prudent police officer to close his eyes." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 353 (1986) (Powell, J., concurring in part and dissenting in part)). "Law enforcement is ill-served by this *in terrorem* restraint." *Id.* (quotations omitted).

But "[w]hen it comes to the First Amendment, . . . we are concerned about government chilling the citizen—not the other way around." *Id.* at 802. *Cf. Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of cert.) ("[W]hy should university officers, who have time

to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?"); *Villarreal*, 17 F.4th at 540–41 ("There is a big difference between split-second decisions by police officers and premeditated plans to arrest a person for her journalism.") (quotations omitted).

\* \* \*

I'll end where I began—with the sad fact that the culture wars are no longer fought only by elected politicians who volunteer for battle, but are increasingly forced upon private citizens in schools and communities across America. But the reason for this reveals an even sadder truth—that we increasingly live in a country that does not value freedom.

Our Nation's commitment to free speech is based on our "firm belief in the robust and fearless exchange of ideas as the best mechanism for uncovering the truth." *Lefebure v. D'Aquilla*, 15 F.4th 670, 674 (5th Cir. 2021) (collecting authorities). That "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). That's why our Founders were "confiden[t] in the power of free and fearless reasoning." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

But free speech and debate are increasingly devalued in the search for truth—to the contrary, they are openly disparaged as harmful to progress.

In some quarters, free speech is nothing more than a tool of patriarchy and white supremacy. As one professor put it, the "idea of intellectual debate and rigor as the pinnacle of intellectualism comes from a world in which white men dominated." Michael Powell, *Science, Ideology and Politics Jostle in the Halls of Academia*, N.Y. Times, Oct. 20, 2021, at A1, A14. Speech is violence—not just metaphorically, but "literally." Lisa Feldman Barrett,

*When Is Speech Violence?*, N.Y. TIMES, July 16, 2017, at SR9. To quote another professor, "[w]ords can have a powerful effect on your nervous system. . . . [They] can make you sick, alter your brain—even kill neurons— and shorten your life." *Id.* So "[i]f words can cause stress, and if prolonged stress can cause physical harm, then it seems that speech—at least certain types of speech—can be a form of violence. . . . From the perspective of our brain cells, [certain speech] is literally a form of violence." *Id.*[9]

Worst of all, these views have begun to affect (some might say infect) our Nation's institutions of learning. And that may be the most tragic development of all. For it is in our classrooms where we are supposed to teach the next generation what it means to be free. Schools should be training students, not sock puppets. *See* Abigail Shrier, *What I told the students of Princeton—Show some self-respect and reclaim your freedom*, SUBSTACK, Dec. 8, 2021. But a new regime has started to sink in—one in which "education is not about teaching people how to think, it's about reeducating them in what to think. . . . [T]he need to feel safe trumps the need to speak truthfully." Bari Weiss, *We Got Here Because of Cowardice. We Get Out With Courage— Say* no *to the Woke Revolution*, COMMENTARY, Nov. 2021, at 53, 54.

Our society and our schools once embraced the quintessentially American maxim: "I disapprove of what you say, but I will defend to the death your right to say it." But our culture and our teachers are increasingly

---

[9] Meanwhile, violence is increasingly considered speech. *See*, *e.g.*, Spencer Neale, *Chris Cuomo: 'Show me where it says that protests are supposed to be polite and peaceful'*, WASH. EXAMINER, Jun. 3, 2020; VICKY OSTERWEIL, IN DEFENSE OF LOOTING: A RIOTOUS HISTORY OF UNCIVIL ACTION (2020); Jesse A. Myerson & José Martín, *9 Historical Triumphs to Make You Rethink Property Destruction*, ROLLING STONE, May 29, 2020 (celebrating "property destruction as a tactic of resistance"). *But see Doe v. Mckesson*, 947 F.3d 874, 878 (5th Cir. 2020) (Ho, J., concurring in denial of rehearing en banc) ("The First Amendment protects protest, not trespass.").

sending citizens and students the opposite message: I disapprove of what you say, and I will use every means at my disposal to stop you from saying it.

Americans are a diverse and passionate bunch. That is a feature of our country, not a bug. But if we can't debate (or even tolerate) one another—if this is where our national culture is going—then we are headed for an ideological arms race, one in which each side in any major debate will escalate every grievance and deploy every tool at their disposal to suppress their opponents. And I fear that, as our Founders predicted, we will all be worse off as a result. *See*, *e.g.*, Katha Pollitt, *The Left Needs Free Speech*, Dissent, Summer 2021, at 45, 47 ("If you call for a bookstore not to stock your enemy's book or rejoice when a problematic classic is taken out of print, your enemy will do the same. Then it just comes down to who has more power. You won't have a universal principle to appeal to.").

It is for all these reasons that I highlight our court's decision today. A decision that affirms our Nation's founding commitment to freedom of speech. A decision that enforces the First Amendment where it is increasingly needed—in public school classrooms nationwide. A decision to deny qualified immunity and hold public officials accountable where the constitutional violation is not only obvious, but trending. I concur in the denial of rehearing en banc.

JENNIFER WALKER ELROD, *Circuit Judge*, joined by JONES, SMITH, DUNCAN, ENGELHARDT, and WILSON, *Circuit Judges*, dissenting from the denial of *en banc* rehearing:

Can a teacher in the Fifth Circuit be held liable for money damages for giving an in-class writing assignment? Until now, no. The district court, the panel majority, and the concurring opinion do not identify a single case where this has happened before—not in the Fifth Circuit, not anywhere else. Yet somehow each finds a way to deny Arnold qualified immunity. Federal judges should not be in the business of policing the lesson plans of public-school teachers. But even when we must, qualified immunity should protect a teacher who (until now) could not have known that his conduct violated a student's constitutional rights. Thus, I respectfully dissent.

For several years, sociology teacher Benjie Arnold required his students to transcribe the words of the Pledge of Allegiance and contemplate Bruce Springsteen's "Born in the U.S.A." as part of an in-class exercise. Arnold administered this assignment to show that people "sometimes recite things every day out of habit and without thinking about what they are actually saying." *Oliver v. Klein Indep. Sch. Dist.*, 448 F. Supp. 3d 673, 686 (S.D. Tex. 2020). Mari Oliver refused to participate. Oliver, who earlier that day exercised her First Amendment right to refuse to pledge allegiance to the American flag, refused to even *write* the words of the Pledge as part of a sociology class assignment. She argued that this assignment *also* violated her First Amendment right to not recite the pledge. Oliver sued, claiming that the in-class writing assignment violated her First Amendment right to refuse to speak.

Arnold claimed he was entitled to qualified immunity and moved for summary judgment, but the district court denied his motion because there was a genuine dispute of material fact over whether Arnold made an "impermissible attempt to promote patriotism." *Id.* at 697. The panel

majority agreed, holding that there was a material dispute over whether Arnold had an "impure motive" in giving this assignment. *Oliver v. Arnold*, 3 F.4th 152, 162 (5th Cir. 2021).

Qualified immunity protects government officials from liability "when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (*en banc*) (*Morgan I*). The action cannot just be illegal; it must be *clearly* illegal. Existing precedent must place the legality of the official's actions "beyond debate" such that every "reasonable official would have understood that what he was doing violate[d]" a constitutional right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 740–41 (2011). And we have been warned repeatedly "not to define clearly established law at a high level of generality," *id.* at 742,[1] otherwise officials would be held liable without "fair warning" that their conduct was unconstitutional, *see Hope v. Peltzer*, 536 U.S. 730, 740–41 (2002). This exacting standard has led us to conclude that "educators are rarely denied immunity from liability arising out of First-Amendment disputes." *Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014) (*Morgan II*). Indeed, the *en banc* court in *Morgan I* (over my dissent) granted school officials qualified immunity because "no federal court of appeals has ever denied qualified immunity to an educator in this area." *Morgan I*, 659 F.3d at 371. Under our rule of orderliness, the *en banc* decision in *Morgan I* controls our qualified-immunity jurisprudence in this regard. *See Planned Parenthood of Greater Tex. Fam. Planning & Preventative Health Servs. v. Kaufman*, 981 F.3d 347, 369 (5th Cir. 2020) (*en banc*).

Nevertheless, the panel majority denied qualified immunity. *Oliver*, 3 F.4th at 162–63. It did so because, in its view, "*Barnette* clearly states that

---

[1] *See City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 11 (2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality.").

teachers and other school officials may not require students to swear allegiance." *Id.* [2] That proposition, it contended (and our concurring colleague agrees), comes from the oft-quoted passage from *Barnette*: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

But when assessing whether a teacher had a "fair warning," looking to a "fixed star" is a sign that the right is being assessed at far too high a level of generality. *See Hope*, 536 U.S. at 741. *Barnette* involved students being required to stand and salute the American flag and pledge fealty to it. In *Morgan* we relied on it for the proposition that students—even elementary school students—have First Amendment rights.[3] Oliver, on the other hand, had to complete an in-class writing assignment, which was designed to teach sociology students that people often do not even pay attention to—much less

---

[2] We have already grappled with the breadth of the *Barnette* decision in *Morgan I*—the plaintiffs from *Barnette* even filed an amicus brief and participated in oral argument to support the First Amendment rights of elementary school students. *See* Brief for Gathie Barnett Edmonds & Marie Barnett Snodgrass as Amici Curiae, *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (No. 09-40373). (Courts have misspelled the Barnetts' name for decades because of a typographical error in the original litigation. *See id.* at 2 n.1.) Still, we construed the scope of *Barnette* (and other First Amendment precedents) narrowly and granted the school officials qualified immunity. *See Morgan I*, 659 F.3d at 386–90.

[3] Students undoubtedly have First Amendment rights. *See Morgan I*, 659 F.3d at 412 (Elrod, J.) (holding that student passing out pencils with the word "Jesus" on them during non-curricular time was protected by the First Amendment); *see also Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 401–02 (5th Cir. 2015) (Elrod, J., concurring) (explaining that a student's off-campus speech was *not* protected because his rap song "was directed to the school and contained threats of physical violence").

mean—things that they regurgitate from memory, [4] be it the Pledge of Allegiance or the lyrics to "Born in the U.S.A." by Bruce Springsteen (a.k.a. "the Boss"). [5] Thus, to deny qualified immunity here is to equate these two clearly different scenarios, which our own qualified immunity jurisprudence forbids.

Importantly and problematically, the panel majority rested its conclusion on the district court's finding a factual dispute about Arnold's "impure motive" in giving this assignment. *Oliver*, 3 F.4th at 162–63. But for qualified-immunity purposes, "a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity." *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001). Granted, under some circumstances we do consider subjective intent, like with race discrimination or First Amendment retaliation claims. *Kinney v. Weaver*, 367 F.3d 337, 373 (5th Cir. 2004) (*en banc*). But as those examples

---

[4] One would think that Oliver might have enthusiastically embraced the opportunity to discuss this very point. This assignment would have been a prime opportunity for Oliver to demonstrate *why* she refused to recite the Pledge earlier that day.

[5] It makes sense that a teacher might couple the transcription of the Pledge with this song, as the lyrics have been historically misunderstood. In fact, the song was most famously played at the 1984 Republican National Convention as a celebration of American values, even though the lyrics belie that very message. *See* Marc Dolan, *How Ronald Reagan Changed Bruce Springsteen's Politics*, Politico Magazine (June 4, 2014), https://www.politico.com/magazine/story/2014/06/bruce-springsteen-ronald-reagan-107448/. The last verse, for example, goes: "Down in the shadow of the penitentiary / out by the gas fires of the refinery / I'm ten years burning down the road / nowhere to run ain't got nowhere to go." Hardly a pro-America message. Ironically, Arnold himself misremembered the lyrics to the song when explaining the purpose of the assignment: "So see times sometimes you see or hear something. Like yesterday's song. It is probably one of the most anti-American songs ever written, but it's got that catchy, catchy lyric, and nobody else knows the words. So I had some students that were bashing the song because they thought it was about America. But then they're gonna find out eventually that it was one of the biggest America bashing songs there was. But it's got that catchy lyric—'Born in *America*.'"

indicate, we do so when an official's subjective state of mind is an element of the claim—for race discrimination, motive is key; for First Amendment *retaliation*, adverse action must be *because of* the plaintiff's protected speech.

But in determining whether speech was compelled in violation of the First Amendment, motive is irrelevant. To establish that her speech was compelled in violation of the First Amendment, Oliver does not have to show that Arnold *intended* to make her pledge loyalty to America. *See Barnette*, 319 U.S. at 640, 642. The focus of our inquiry is not the teacher's motive, but the student's compelled act. *Post* at 34 (Duncan, J., dissenting from the denial of rehearing *en banc*). Otherwise, the vindication of a student's constitutional rights hinges on a teacher's earnestness rather than the objective reasonableness of the teacher's actions. True, this approach provides Oliver a short-term win: She may proceed to trial on her claims. But in the long-run, students lose. Because a student must now prove her educator's "impure motive," a student is much less likely to prevail at the end of the day. *See Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 349 (5th Cir. 2017) ("It is true that direct evidence of [a teacher's] motive or intent can be hard to come by.").[6]

Our sister circuits have wisely steered clear of this improper-motive path. In the Fourth Circuit, a teacher can require a student to write out the Five Pillars of Islam so long as the student is not required to "profess or accept the tenets of Islam." *Wood v. Arnold*, 915 F.3d 308, 319 (4th Cir. 2019). In the Third Circuit, a teacher may force a student to "speak or write on a particular topic even though the student may prefer a different topic,"

---

[6] The panel also justified its consideration of Arnold's subjective motives by relying on our decision in *Brinsdon*. There, this court considered the teacher's subjective intentions in determining that the teacher was entitled to qualified immunity. *Brinsdon*, 863 F.3d at 349. To the extent that the court in *Brinsdon* did so in this context, it ran afoul of our qualified immunity jurisprudence—yet another reason to hear this case *en banc*.

provided that the teacher does not "demand that a student profess beliefs or views with which the student does not agree." *C.N. v. Ridgewood Bd. of Ed.*, 430 F.3d 159, 187 (3d Cir. 2005). And in the Ninth Circuit, a teacher can make a student "write a paper from a particular viewpoint, even if it is a viewpoint with which the student disagrees, so long as the requirement serves a legitimate pedagogical purpose." *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002).

The First Amendment gives federal judges no special insight into whether it is a good idea to give an assignment asking sociology students to transcribe the Pledge of Allegiance from memory (especially when required to contemplate the lyrics of "Born in the U.S.A.").[7] It certainly gives them no license to authorize a damages award against teachers for assignments they deem insufficiently "pedagogical." That is because it is generally well-established that teachers have wide latitude to, well, teach. *See, e.g.*, *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) (noting the "high degree of deference that courts must pay to [an] educator's professional judgment"); *Morse v. Frederick*, 551 U.S. 393, 409 (2007) (teachers have "a difficult job, and a vitally important one"). And students, by and large, may be compelled to listen (and hopefully learn). *See Morgan I*, 659 F.3d at 417–18 (Elrod, J., dissenting) (noting that teachers have more latitude to control student speech during "curricular" times, as opposed to "non-curricular"

---

[7] Our concurring colleague says that "Arnold's sociological exercise for high school seniors bears no resemblance to the traditional Pledge memorization assignment typically assigned in elementary school." *Ante* at 13 (Ho, J., concurring in the denial of rehearing *en banc*). Despite his insistence that this assignment is too elementary to be taught to high school students, Arnold's testimony reveals quite the opposite: "This lesson is borne out when most of the students, who daily orally recite the Pledge, cannot write the words on paper."

times).  Were it not so, "a student who refuses to respond in class or do homework would not suffer any consequences." *Brinsdon*, 863 F.3d at 350.

Our concurring colleague is concerned about the prospect of teachers indoctrinating students with their political agendas.  But upending our court's qualified immunity jurisprudence while shirking our court's rule of orderliness is not the solution to this problem.[8]  There is, of course, the Fourteenth Amendment (and other federal or state laws) to protect students against discrimination.  With discrimination, courts unquestionably *do* have a role to play in managing school curricula: prohibiting discrimination.  If a given curriculum is not discriminatory, but merely one with which parents disagree, there are other remedies available to them.  That is the domain of school boards, made up of "elected officials accountable to the American voter."  *Texas v. Rettig*, 993 F.3d 408, 410–11 (5th Cir. 2021) (Ho, J., dissenting from the denial of rehearing *en banc*).  Parents may see to it that their children avoid such indoctrination—not in a federal courthouse, but in a local school board meeting or at the ballot box.  And, ultimately, parents retain the power to choose where their children attend school.

In the meantime, teachers in the Fifth Circuit are left in the lurch. How are they to know whether their lesson plans conflict with "fixed star[s]" in our "constitutional constellation"?  Read at the interstellar level of generality, qualified immunity provides no safe harbor.  I respectfully dissent from the denial of *en banc* rehearing.

---

[8] It is not necessary for this court to contort our qualified immunity jurisprudence by importing a motive requirement for students to have a remedy.  As for the First Amendment, claims against individual teachers could proceed without resort to motive, where clearly established law exists and an objectively reasonable teacher would know that the compelled speech was prohibited.  Furthermore, claims against a school district could proceed where a district's policy illegally compels student speech.

Stuart Kyle Duncan, *Circuit Judge*, joined by Jones[*], Smith, Elrod, Engelhardt, and Wilson, *Circuit Judges*, dissenting from denial of en banc rehearing:

In our circuit, public school teachers can make students pledge allegiance to Mexico but can't make students write down our own pledge. The first assignment is a "cultural and educational exercise," *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 349 (5th Cir. 2017), but the second is a compelled patriotic statement forbidden by the First Amendment. *Oliver v. Arnold*, 3 F.4th 152, 159–60 (5th Cir. 2021). A teacher who gives the first assignment merits qualified immunity, but a teacher who gives the second will have to convince a jury he had a "pedagogical purpose." *Id.* at 162. I assume the reverse is also true. So, a teacher can make students pledge allegiance to the American Flag as a "cultural and educational exercise" but can't make students write down the Mexican pledge if he wants to promote *el Patriotismo*.

Our law in this area is, in other words, a dumpster fire. We should have taken this case en banc to put it out. Then we could have addressed in a more coherent way how the First Amendment applies to student speech and public school curricula, an important and developing field.[1] For reasons that baffle me, a majority of my colleagues declines the opportunity.

---

[*]Judge Jones joins all save part III.

[1]*See, e.g.*, *Arce v. Douglas*, 793 F.3d 968, 981–83 (9th Cir. 2015) (observing that "[a]t least four other circuits have grappled with the breadth of a student's First Amendment rights in the context of the development of a school curriculum") (citing *Virgil v. Sch. Bd. of Columbia Cty.*, 862 F.2d 1517 (11th Cir. 1989); *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771 (8th Cir. 1982); *Zykan v. Warsaw Comm. Sch. Corp.*, 631 F.2d 1300 (7th Cir. 1980); *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005)); *see also* H.B. 3979, 87th Leg., (Tex. 2021) (forbidding state school employees from teaching, *inter alia*, that "an individual's moral character is necessarily determined by his or her race or sex").

I've already explained why the panel tortures *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), by extending it to written assignments; why the teacher's motives for giving such assignments are immaterial; and why—even assuming a constitutional violation—the teacher merited qualified immunity because this situation falls outside any clearly established law. *See Oliver*, 3 F.4th at 163–66 (Duncan, J., dissenting). Here, I will only highlight why the panel decision plainly merits en banc review.

**I.**

To begin with, this case is the first ever to apply *Barnette* to a written assignment. In *Barnette*, students had to salute the Flag while reciting the Pledge. 319 U.S. at 627–28. The decision said nothing about the words students might have to write on a history test or a philosophy paper. It should be obvious why. Pretending that such assignments "compel student speech" is courting chaos, as anyone who has faced a class full of teenagers would know.[2] It doesn't matter that the assignment here included writing the Pledge's words. The assignment had none of *Barnette*'s "prescribed ceremony"—"the compulsory flag salute and pledge [that] require[d] affirmation of a belief and an attitude of mind." 319 U.S. at 634. And the panel's idea that *Barnette* applies because it forbade compulsion "by word or act" wilts after two seconds' scrutiny. *Oliver*, 3 F.4th at 163 (quoting *Barnette* 319 U.S. at 642). The "act" compelled in *Barnette* was a "'stiff-arm' salute . . . the right hand raised with palm turned up," not writing an essay on Old Glory. 319 U.S. at 628. The panel's decision to uncritically extend *Barnette*

---

[2] *Cf. Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 141 S. Ct. 2038, 2050 (2021) (Alito, J., concurring) ("As a practical matter, it is impossible to see how a school could function if administrators and teachers could not regulate on-premises student speech, including by imposing content-based restrictions in the classroom. In a math class, for example, the teacher can insist that students talk about math, not some other subject.").

to a written assignment warrants en banc review. *See* FED. R. APP. P. 35(b)(1)(A).[3]

JUDGE HO's concurrence also cites no case applying *Barnette* to a written assignment. Yet he claims *Barnette* forbids the assignment here because it "forc[ed] a public school student to embrace a particular political view." HO, J., concurring in denial of rehearing en banc, at 2. That offers little help. Does it mean *Barnette* bars any written assignment that, in a student's opinion, requires "embracing a particular political view"? If so, then the panel decision heralds a brave new world where First Amendment litigation will become a regular part of curricular planning. Must teachers now shy away from asking students to memorize any historical statement with a "particular political view"—say, the Declaration of Independence, the Preamble to the Constitution, or the speeches of Abraham Lincoln and Martin Luther King, Jr.? *See Oliver*, 3 F.4th at 165–66 (Duncan, J., dissenting). If that sounds ridiculous, it's meant to be. Yet maybe that's where the panel decision leads us. We should have taken this case en banc to find out.

## II.

Second, the panel creates a circuit split. In *Wood v. Arnold*, 915 F.3d 308 (4th Cir. 2019), the Fourth Circuit declined to apply *Barnette* to a written class assignment. Students had to fill in these blanks on a history worksheet: "There is no god but _____ and Muhammad is the _____ of Allah." *Id.* at 312–13 (the answers were "Allah" and "messenger"). Rejecting a

---

[3] For the same reasons, the teacher should at a minimum have received qualified immunity because he did not violate any clearly established law. *See Oliver*, 3 F.4th at 164 (Duncan, J., dissenting). Any disputes over Arnold's motives for giving the assignment are immaterial and so do not present a jurisdictional impediment to finding qualified immunity. *See id.* at 165 (Duncan, J., dissenting); *see also infra*.

student's compelled speech claim, the court found *Barnette* inapplicable. *Id.* at 318–19. That was because the assignment "did not require [students] to profess or accept the tenets of Islam," nor were students "asked to recite the *shahada*,[4] nor . . . to engage in any devotional practice related to Islam." *Id.* at 319. The student only had "to write . . . two words . . . as an academic exercise to demonstrate her understanding of the world history curriculum." *Ibid.* By contrast, *Barnette* involved "compelling students to declare a belief through mandatory recital of the pledge." *Ibid.* (cleaned up) (quoting *Barnette*, 319 U.S. at 631–32). *Wood* did not rely on, or even mention, the teacher's "motivations" for giving the assignment.

*Wood* would come out differently in our circuit. Instead of winning dismissal of the First Amendment claim, the teacher would have to prove her motives for assigning the worksheet. *Oliver*, 3 F.4th at 161. Were there "pedagogical" or "didactic reasons" for the assignment? *Id.* at 162. Or was it given to "foster the spirit of [Islam]"? *Ibid.* (cleaned up) (quoting *Barnette*, 319 U.S. at 625). A jury would sort out whether the teacher had "impermissible purposes" and levy damages if she did. *Ibid.* A core function of en banc review is to address such circuit splits. *See* Fed. R. App. P. 35(b)(1)(B). Yet a majority of our court declines.

## III.

Third, the panel is wrong that the teacher's "motivations" matter. *Barnette* does not support that view. It accepted as legitimate the school board's purpose (*i.e.*, fostering "[n]ational unity") but rejected the "means for its achievement" (*i.e.*, "compelling the flag salute and pledge"). *See* 319

---

[4] The fill-in-the blanks statement is known as the *shahada*, a declaration that forms part of the "Five Pillars of Islam." *Wood*, 915 F.3d at 312–13.

U.S. at 640, 642.[5] To be sure, the panel cites our *Brinsdon* decision as authority for weighing the assignment's "pedagogical purposes." *Oliver* 3 F.4th at 162 (citing *Brinsdon*, 863 F.3d 338). But *Brinsdon* was mistaken on that point.

*Brinsdon* reasoned this way: "[W]hat the [Supreme] Court found objectionable in both *Barnette* and *Wooley* was *the state's purpose* of 'fostering public adherence to an ideological point of view . . . .'" *Brinsdon*, 863 F.3d at 349 (emphasis added) (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)). That misreads *Wooley*. The page cited says nothing about "the state's purpose." Instead it says: "[W]e are faced with *a state measure* [*i.e.*, requiring the state motto on license plates] which forces an individual . . . to be an instrument for fostering public adherence to an ideological point of view . . . ." *Wooley*, 430 U.S. at 715 (emphasis added). *Wooley* is talking about the compelled act itself, not the state's "motives" for compelling it. *Brinsdon* was thus wrong and so was the panel. We should have gone en banc to fix that error, which has now distorted our precedent and which provides the panel's sole reason for dismissing the appeal. *See Oliver*, 3 F.4th at 162.[6]

The only possible source for the panel's "motive" rule is an out-of-circuit decision the panel doesn't even cite, *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004). It held that teachers compelled a religious student to speak when, as part of an acting exercise, they made her say words she found

---

[5] The district court therefore erred in supposing it "impermissible" that a teacher might want to "instill patriotism" in his students. *See Oliver v. Klein Indep. Sch. Dist.*, 448 F. Supp. 3d 673, 697–98 (S.D. Tex. 2020). Instilling patriotism is a legitimate and praiseworthy goal for any teacher. *See Barnette*, 319 U.S. at 640 ("National unity as an end which officials may foster by persuasion and example is not in question."). What *Barnette* condemned was not "instilling patriotism" but doing so by a coercive pledge ceremony.

[6] Judge Ho suggests *Brinsdon* was wrongly decided. *See* Ho, J., concurring in denial of rehearing en banc, at 5 n.1 (suggesting teacher should have been denied qualified immunity). All the more reason, then, to take this case en banc and clarify our precedent.

offensive. *See id*. at 1290. Whether the First Amendment allowed this turned on whether the curricular choice "was truly pedagogical or whether it was a pretext for religious discrimination." *Id.* at 1293.

Our circuit has never expressly adopted *Axson-Flynn*. We should think twice before we do. The Tenth Circuit spun its "truly pedagogical" standard out of two Supreme Court decisions addressing issues quite different from class assignments. Primarily, the court relied on *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), which rejected a free speech challenge to a school's censoring a student newspaper, provided the school's actions were "reasonably related to legitimate pedagogical concerns." *Id.* at 273; *see Axson-Flynn*, 356 F.3d at 1285. The court also relied on *Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985), which rejected a due process challenge to a university's not allowing a student to retake an exam. *Ewing* opined that courts should not override such a "genuinely academic decision" unless the "person or committee responsible did not actually exercise professional judgment." *Id.* at 225; *see Axson-Flynn*, 356 F.3d at 1293.

It strikes me as a long and unwise leap to apply *Hazelwood* or *Ewing* to evaluate a teacher's motives for assigning classwork. *Hazelwood* addressed when administrators may "censor a school-sponsored publication, theatrical production or other vehicle of student expression," 484 U.S. at 273, not what assignments teachers may give. *Ewing* was even further afield. Neither decision touched on compelled speech.[7] And do we really want federal judges

---

[7] Moreover, *Axson-Flynn*'s alchemizing those decisions into a compelled speech test has led to at least one bizarre result. Applying *Axson-Flynn*, the Tenth Circuit held that a student could be forced to issue a written public apology for mentioning "Jesus Christ" in her valedictory speech. *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1231–32 (10th Cir. 2009). The court thought the apology was "reasonably related to [the school's] legitimate pedagogical concerns" that the student's reference to Jesus not be "erroneously attributed to the school." *Id.* at 1231 (quoting *Axson-Flynn*, 356 F.3d at 1290; *Hazelwood*, 484 U.S. at 271). So the court dismissed the student's compelled speech claim. *Id.* at 1232.

and juries deciding whether class assignments are "truly pedagogical"? If I wanted to do that, I would have run for school board. *See Morse v. Frederick*, 551 U.S. 393, 421 (2007) (Thomas, J., concurring) ("Local school boards, not the courts, should determine what pedagogical interests are 'legitimate' and what rules 'reasonably relat[e]' to those interests.") (quoting *Hazelwood*, 484 U.S. at 273); *but see* Ho, J., concurring in denial of rehearing en banc, at 8 (proposing a jury should decide whether "the Pledge assignment served [a] legitimate pedagogical purpose"). In any event, the panel does not say whether it draws on any of those precedents, and so our law will remain unclear. Had we gone en banc, we could have given careful thought to the matter. But, again, a majority of the court has thought otherwise.

## IV.

Finally, to find no compelled speech in this case would not leave other students—perhaps faced with an offensive assignment or an abusive teacher—without remedy. Students might challenge an assignment under the Free Exercise or Establishment Clauses.[8] Or students faced with a racist curriculum might sue (along with parents and teachers) under the Equal Protection Clause or civil rights laws.[9] And surely there are cases where students—or teachers, for that matter—are actually compelled to express

---

[8] *See Oliver*, 3 F.4th at 165 n.2 (Duncan, J., dissenting) ("One can also imagine a written classroom assignment so contrary to a student's religious beliefs that making him do it would violate the Free Exercise Clause."); *see also Wood*, 915 F.3d at 313–18 (examining student's claim that history curriculum's "comparative faith statement . . . endorsed a view of Islam over Christianity in violation of the Establishment Clause").

[9] *See Cajune v. Indep. Sch. Dist. 194*, No. 0:21-CV-01812 (D. Minn. filed Aug. 3, 2021) (compl. at 9–11) (alleging Title VI claim on behalf of fifth graders shown video stating "structural racism . . . makes life easier for White people and more difficult for Black people and People of Color"); *ibid.* (Title VI claim alleging school committee forbade parents of "Japanese, Norwegian, Dutch, Irish, and so on" ancestry to participate in event "focused on centering equity and bringing awareness" to "the BIPOC community").

themselves in violation of the First Amendment.[10] For that reason, I agree with JUDGE HO that the cases he identifies may pose actual constitutional violations. *See* HO, J., concurring in denial of rehearing en banc, at 1–2.

But those cases are not this one. Here, the panel accepts an unprecedented application of *Barnette* that warps the compelled speech doctrine, splits with another circuit, and sets up federal judges and juries as arbiters of whether teachers should pay damages for giving "non-pedagogical" assignments. A majority of the court unwisely declines to stop this misbegotten experiment in its tracks.

I respectfully dissent from denial of en banc rehearing.

---

[10] *See, e.g.*, *Clark v. Democracy Prep Public Sch., Inc.*, No. 2:20-CV-02324 (D. Nev. filed May 3, 2021) (compl. at 18) (alleging student was compelled "to proclaim in class and in assignments his race, color, sex, gender, and religious identities"); *see also Meriwether v. Hartop*, 992 F.3d 492, 498, 511–12 (6th Cir. 2021) (holding public university violated teacher's Free Speech and Free Exercise rights by compelling him to address students by their "preferred pronouns"); *Henderson v. Sch. Dist. of Springfield R-12*, No. 6:21-CV-03219 (W.D. Mo. filed Aug. 18, 2021) (compl. at 15–16) (First Amendment claim alleging teachers were required during mandatory equity training to hold up "agree" or "disagree" signs in response to statements such as "Parents are the oppressors of their children" and "White people are oppressors").

ANDREW S. OLDHAM, *Circuit Judge*, joined by ELROD, *Circuit Judge*, dissenting from denial of *en banc* rehearing:

I agree with Judge Duncan that we should've reheard this case *en banc*. I write separately to note my slightly different understanding of the important constitutional rights at stake.

It is well settled that students do not give up their First Amendment rights "at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). And federal courts bear a solemn responsibility to vindicate those rights. *See, e.g.*, *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2049 (2021) (Alito, J., concurring).

Our track record for doing so, however, is checkered at best. Just four years ago, our court granted qualified immunity to a teacher who required students to recite the Mexican pledge of allegiance. *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 348 (5th Cir. 2017). Today's decision reaches the opposite result for the American pledge. The distinction purportedly turns on the *purity* (whatever that means) of the *motives* (however we find those) guiding the different teachers. *See Oliver v. Arnold*, 3 F.4th 152, 162–63 (5th Cir. 2021) (embracing an "impure motive" test).

The importance of students' constitutional rights demands far better. The "impure motive" test reaffirms none of our Nation's founding principles; it undermines them. We should've reheard this case *en banc*.